**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2527-14T3
　　　　　　　　A-2528-14T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

　　　Plaintiff-Respondent,

v.

J.B. and L.B.,

　　　Defendants-Appellants.

————————————————————

IN THE MATTER OF D.B., T.B.,
and N.B.,

　　　Minors.

————————————————————

　　　　　Argued November 10, 2016 — Decided September 22, 2017

　　　　　Before Judges Simonelli, Carroll and Gooden
　　　　　Brown.

　　　　　On appeal from the Superior Court of New
　　　　　Jersey, Chancery Division, Family Part, Bergen
　　　　　County, Docket No. FN-02-0093-12.

　　　　　Deric Wu, Assistant Deputy Public Defender,
　　　　　argued the cause for appellant J.B. (Joseph
　　　　　E. Krakora, Public Defender, attorney; John
　　　　　A. Salois, on the briefs).

Clara S. Licata, Designated Counsel, argued the cause for appellant L.B. (Joseph E. Krakora, Public Defender, attorney; Ms. Licata, on the briefs).

Natasha C. Fitzsimmons, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Jessica E. Goldstein, on the brief).

Olivia Belfatto Crisp, Assistant Deputy Public Defender, argued the cause for minor D.B. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Ms. Crisp, on the brief).

PER CURIAM

In these Title 9 matters,[1] defendants J.B. (James),[2] and L.B. (Laura), appeal from the May 8, 2012 Family Part order, which found they medically neglected their son, D.B. (David), within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b) by refusing to consent to inpatient psychiatric treatment after a purported suicide attempt. Defendants also appeal from the December 11, 2014 order terminating the litigation. For the following reasons, we affirm.

David was born in 1994. He was diagnosed with diabetes at age fourteen, is insulin-dependent, and has a history of anxiety

---

[1] We consolidate these appeals for the purpose of this opinion only.

[2] Pursuant to Rule 1:38-3, we use fictitious names for the parties to protect their identities. We also use initials to identify the witnesses who testified at the factfinding hearing.

and depression for which he received psychiatric treatment and was prescribed psychotropic medication. With defendants' knowledge, David dropped out of school at age sixteen and in May 2011, he stopped seeing his psychiatrist and taking his psychotropic medication.

In August 2011, the family was on vacation when David's girlfriend of two years called him and ended their relationship. David called his girlfriend when he returned home, but she refused to reconsider. David then went to her home and told her he was going to kill himself by injecting insulin without eating. He then ran from the home and claimed to have injected ten units of insulin.

David's girlfriend called Laura and told her what happened. Laura called David's pediatrician, who advised her to take him to the hospital to have his blood sugar checked to see if he had injected insulin. At the hospital, David told an emergency room doctor, Dr. L., that he had an argument with his girlfriend two days prior, was sad ever since, and injected ten units of insulin without eating. Laura told Dr. L. that David had been crying "a lot" during this time. David did not respond when Dr. L. asked if he was trying to kill himself. Although David's blood tests showed his sugar level was normal, Dr. L. noted: "Although it is unclear as to whether or not [David] had discrete suicidal

planning, the insulin administration was an impulsive move at the very least. Fortunately, [David's] sugar is normal at this time."

A crisis clinician, M.F., evaluated David in the emergency room. David told M.F. that his girlfriend ended their relationship and he was severely depressed, feeling very tired, and had not eaten over the past weekend. David also told M.F. he had injected insulin without eating to kill himself. M.F. concluded that David was a danger to himself, was not safe, and needed further evaluation. M.F. recommended to defendants that David be immediately admitted for inpatient psychiatric treatment. Defendants refused to consent to inpatient treatment, opting instead to take David to his psychiatrist and pediatrician the next day. M.F. determined this was not an appropriate level of care because David had not seen his psychiatrist for some time, and defendants did not understand the magnitude of his actions.

A psychiatrist, Dr. D., evaluated David in the emergency room. David told Dr. D. that he was experiencing passive suicidal thoughts for some time, had injected insulin, wanted to kill himself, and did not care if he lived or died. David also said he had been depressed for some time, had been crying "a lot," had not attended school, and the break up with his girlfriend was the reason for his suicide attempt.

Dr. D. diagnosed David with depressive disorder, not otherwise specified, and recommended inpatient psychiatric hospitalization for observation and stabilization. Dr. D. opined within a reasonable degree of medical certainty that David's judgment was impaired, and because he had acted in a dangerous manner, he needed to be in a safe place for at least a brief period of time and would be at risk of recurrence if he left the hospital and was exposed to any stressors. Dr. D. emphasized he would have recommended inpatient treatment even if David had not injected insulin because David had expressed suicidal ideations. The doctor acknowledged that David's blood sugar level was within normal limits, but could not opine this was evidence that David did not inject insulin.

Defendants initially consented to David's admission to inpatient treatment at Summit Oaks, but later changed their minds. A second psychiatrist, Dr. N., was then called to conduct a second evaluation. David told Dr. N. that he had injected insulin without eating. David initially did not respond when asked if this was a suicide attempt, but later denied he attempted suicide or had any suicidal ideations or plans. David admitted he was depressed and would benefit from some inpatient care, but said he wanted to go home. Dr. N. agreed with Dr. D.'s diagnosis of depressive disorder, not otherwise specified. Dr. N. opined within

a reasonable degree of medical certainty that David's insight and judgment were questionable, situational stressors prompted David to inject insulin, David required inpatient treatment for stabilization, and inpatient treatment would provide David with safety and prevent a recurrence. Dr. N. explained to defendants the danger of recurrence.

Dr. N. acknowledged that David's blood sugar level was fairly normal, but could not opine this was evidence that David did not inject insulin. However, Dr. N. opined that an attempted suicide "is always considered dangerous behavior and that's why you recommend inpatient care," and that even if David had not injected insulin, "this was a cry for help."

Defendants refused to consent to inpatient treatment. Laura did not believe David had injected insulin, and James did not believe David made a suicide attempt. James also saw no need for David to be admitted to a psychiatric facility or to have been receiving any psychiatric treatment between May 2011 and August 2011.

The situation at the hospital escalated and hospital staff called the Ridgewood Police and the Division of Child Protection and Permanency (Division). The responding Division caseworker, H.C., testified that defendants were yelling at hospital staff, including M.F., and kept insisting they wanted to remove David

6                                                                    A-2527-14T3

from the hospital.  The Division effected a Dodd removal,[3] assumed temporary care, custody, and supervision of David, and admitted him to Summit Oaks for inpatient psychiatric treatment.

In a comprehensive May 8, 2012 oral opinion, the trial judge held that defendants' refusal to consent to inpatient treatment constituted medical neglect that placed David at risk of harm. The judge found as follows:

> [E]ven with the best of intentions, [defendants] were willful and wanton in their decision making.  Teenage suicide is a serious issue.  [Defendants'] decisions . . . were wrong headed, constituted willful and wanton negligence, and subjected their child to risk of harm.
>
> . . . .
>
> [David's] psychiatric status on that evening in the hospital did not seem to overly concern [defendants].  [The hospital's] psychiatrists were focused on the suicidal ideation.  They concluded that based upon [David's diabetes], his history of depression, the fact that he had been treated by a psychiatrist, but had stopped going, the fact that he had been on [psychotropic] medication, but had taken himself off the medication, the fact that he was not in school, not working, and had clearly expressed to [emergency room] doctors that he had injected himself with insulin to harm himself, and [did not] care whether he lived or died, and that three psychiatrists, two from [the hospital] and one from Summit Oaks, opined that [David] was in need of inpatient [treatment] to stabilize his

---

[3] A "Dodd" removal refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82, as amended.

mental state, that he was clearly impaired, and that release would have risked a recurrence of the behavior. This child, after all, did have access to insulin.

. . . .

The fact that [David] may or may not have actually taken the insulin is of no moment to this [c]ourt. When a child threatens suicide, with a history and the situation stressors such as the ones placed upon [David] in this case, this was, as I've already indicated, a cry for help. Inpatient was the only decision at that time and place according to the evaluating psychiatrists.

Calling a psychiatrist the next day from home was not the proper course of treatment, especially when [defendants] and [David] had not been following through with psychiatric treatment and medication monitoring. And even if they had, it might not have been the proper course of treatment.

[Defendants'] refusal to consent to [David] being placed inpatient placed [David] at risk of harm. The harm, as articulated by the psychiatrists testifying in this case, was the risk that [David] would . . . hurt himself, and that . . . the behavior would recur. Either the threat of suicide or attempted suicide.

This appeal followed.

Our Supreme Court has set forth the standard that governs Title 9 cases as follows:

[A]ppellate courts defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold

8                                                      A-2527-14T3

record . . . . [B]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding.

[N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (citations omitted).]

Thus, "if there is substantial credible evidence in the record to support the trial court's findings, we will not disturb those findings." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). However, "if the trial court's conclusions are clearly mistaken or wide of the mark [we] must intervene to ensure the fairness of the proceeding." Id. at 227 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). We owe no deference to the trial court's legal conclusions, which we review de novo. Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995).

"To prevail in a Title [Nine] proceeding, the Division must show by a preponderance of the competent and material evidence that the defendant abused or neglected the affected child." N.J. Div. of Child Protection & Permanency v. B.O., 438 N.J. Super. 373, 380 (App. Div. 2014). "The Division need only show that it was more likely than not that the defendant abused or neglected the child." Ibid.

An "abused or neglected child" means, in pertinent part, a child under the age of eighteen years

whose physical, mental, or emotional condition
has been impaired or is in imminent danger of
becoming impaired as the result of the failure
of his parent or guardian, as herein defined,
to exercise a minimum degree of care . . . in
providing the child with proper supervision
or guardianship, by unreasonably inflicting or
allowing to be inflicted harm, or substantial
risk thereof, including the infliction of
excessive corporal punishment; or by any other
acts of a similarly serious nature requiring
the aid of the court[.]

[N.J.S.A. 9:6-8.21(c)(4)(b).]

Interpreting N.J.S.A. 9:6-8.21(c)(4)(b), our Supreme Court has held that mere negligence does not trigger the statute. N.J. Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 306-07 (2011); G.S. v. Dep't of Human Servs., 157 N.J. 161, 172-73 (1999). Rather, the failure to exercise a minimum degree of care refers "to conduct that is grossly or wantonly negligent, but not necessarily intentional." T.B., supra, 207 N.J. at 305 (quoting G.S., supra, 157 N.J. at 178). The failure to exercise a minimum degree of care "at least requires grossly negligent or reckless conduct." Id. at 306.

Although the distinction from ordinary negligence cannot be precisely defined, McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970), the essence of gross or wanton negligence is that it "implies that a person has acted with reckless disregard for the safety of others." G.S., supra, 157 N.J. at 179. Further, willful or wanton conduct is that which is "done with the knowledge that

10

injury is likely to, or probably will, result[,]" and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Id. at 178 (quoting McLaughlin, supra, 56 N.J. at 305). However, if the act or omission is intentionally done, "whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant," and "[k]nowledge will be imputed to the actor." Ibid. Such knowledge is imputed "[w]here an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences." Id. at 179.

A determination of whether a parent's or guardian's conduct "is to be classified as merely negligent, grossly negligent, or reckless can be a difficult one." T.B., supra, 207 N.J. at 309. "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S., supra, 157 N.J. at 181-82. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182. The mere lack of actual harm to the child is irrelevant, as "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of DMH, 161 N.J. 365, 383 (1999).

"[T]he standard is not whether some potential for harm exists." N.J. Dep't of Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 168 (App. Div. 2009). "A parent fails to exercise a minimum degree of care when [he or] she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to the child." Ibid. (quoting G.S., supra, 157 N.J. at 181).

We are satisfied from our review of the record that the judge's findings are well-supported by substantial, competent, and credible evidence. This includes the uncontroverted testimony of two expert psychiatrists and a crisis clinician. The record supports the conclusion that David required immediate inpatient psychiatric treatment; hospital physicians recommended to defendants such a course of treatment; and defendants knew or should have known that such a course of treatment was medically necessary for David, but they deliberately refused to follow that course.

David was clearly in crisis when he came to the emergency room. Whether or not he actually injected insulin or attempted suicide, he had expressed suicidal ideations, was severely depressed, was not receiving psychiatric treatment or taking his prescribed psychotropic medication, and did not care if he lived or died. He was a danger to himself and needed immediate inpatient

treatment for stabilization. Defendants were aware of, and ignored, the potentially serious consequences and refused to consent to inpatient treatment that would prevent David from harming himself or having his mental or emotional condition impaired. We are satisfied that defendants medically neglected David within the meaning of N.J.S.A. 9:6-8.21(a)(4)(b) by refusing to consent to inpatient treatment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION