24 A.3d 290

DEPARTMENT OF CHILDREN AND FAMILIES, DIVISION OF
YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT,
v. T.B., DEFENDANT–APPELLANT.

Argued February 28, 2011—Decided August 8, 2011.

*Lynn E. Staufenberg* argued the cause for appellant.

*Lauren F. Carlton,* Assistant Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Lewis A. Scheindlin* and *Andrea M. Silkowitz,* Assistant Attorneys General, of counsel; *Ms. Carlton* and *Rebecca A. Glich,* Deputy Attorney General, on the briefs).

*Mary M. McManus–Smith* argued the cause for amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Ms. McManus–Smith, Mr. Miller,* and *Marisa B. De-Fazio,* on the brief).

*T. Gary Mitchell*, Deputy Public Defender, submitted a brief on behalf of Public Defender Parental Representation (*Yvonne Smith Segars*, Public Defender, attorney; *Mr. Mitchell* and *Beatrix W. Shear*, Deputy Public Defender, of counsel and on the brief).

Justice LONG delivered the opinion of the Court.

On this appeal, we revisit the language of Title Nine, *N.J.S.A.* 9:6–1 to –8.106, in particular, *N.J.S.A.* 9:6–8.21(c)(4), which defines the term "abused or neglected child." Specifically, we must determine whether a finding of neglect was properly entered against a mother who left her four-year-old child unsupervised for two hours under the mistaken belief that his grandmother was home. The Appellate Division affirmed the neglect determination by the Director of the Division of Youth and Family Services (DYFS). We granted the mother's petition for certification, *N.J. Div. of Youth & Family Servs. v. T.B.*, 204 *N.J.* 40, 6 *A.*3d 442 (2010), and now reverse.

## I.

### A.

The following facts, derived from the evidence adduced at the Office of Administrative Law (OAL) hearing, form the backdrop for this appeal: In early spring of 2007, Susan and her then four-year-old-son, John, were living with Susan's mother, Mary, and step-father, Jim (collectively "grandparents")[1], in a ranch-style home in Atlantic Highlands. Although Susan and John lived downstairs in a space with its own bedrooms, living room, bath-room, and kitchen, the entire house was accessible to John, and he moved freely from Susan's living area to the upstairs portion of the home where his grandparents lived. At the time of the incident giving rise to this appeal, Mary and Jim assisted in caring for John on a regular basis because Susan's schedule was extreme-ly busy: she worked full time as a teacher, attended post-graduate

---

[1] Fictitious names will be used to refer to the family members involved in this action.

courses, and supplemented her income by instructing yoga classes. Mary and Jim's work schedules afforded them the ability to care for John on a routine basis.

On Sunday, March 25, 2007, Susan and John spent the day visiting family. By the time they returned home, between 7:00 p.m. and 7:30 p.m., John had fallen asleep in the car, and Susan immediately put him to bed. Susan saw Mary's car in the driveway and assumed that she was in the house sleeping because she had been ill; because she was "always home" and "in bed early" on Sunday nights to prepare for work on Monday morning; and because Jim worked the night shift on Sundays. With the belief that Mary was home, Susan went to eat dinner with a friend. In fact, Mary was not home; rather, she made an impromptu decision to go with Jim to New York.

Shortly after 9:00 p.m., John woke up and discovered that he was alone. He left the house, crossed the street—"a 25 mile[-]an[-]hour residential street with constant traffic"—and told his neighbor that he could not find his mother. The neighbor contacted Officer Duda, a policeman who lived nearby. Duda knocked on Susan's door, and when no one responded, he called the Atlantic Highlands Police Department.

Sergeant Stone arrived at Susan's home and noted that there were two vehicles in the driveway: Susan's and Mary's. While Stone waited for another officer to arrive, he briefly interviewed John, who was visibly upset and wanted his mother. When the second officer arrived, Stone entered the house and determined that no one was home.

Between 9:30 p.m. and 10:00 p.m., Susan returned from dinner. Upon seeing the officers, she immediately became worried that something had happened to her parents. Stone informed Susan that her parents were not home, and that John had walked across the street to a neighbor's house. Hearing that news, Susan became upset and began to cry. Stone observed that John was "very happy" when reunited with Susan, but was obviously upset because he said to his mother, "I thought you went to Heaven."

When she calmed down, Susan informed Stone that, although "she did not specifically speak [to] her" mother that evening, she believed, based on past experience, that Mary was home when she left for dinner. Stone concluded that the matter needed to be reviewed further and, although he did not arrest Susan, he transported her to the police station, where she received *Miranda*[2] warnings and voluntarily gave a handwritten statement.

Mary and Jim returned from New York and arrived at the police station to give statements at approximately 11:00 p.m. They attested to Susan's version of the events, in particular to the impromptu nature of the trip to New York and that Mary is "always home on Sunday nights." [3] Stone turned the matter over to DYFS, and no criminal charges were filed against Susan because the police department did not believe there to be "sufficient grounds for a violation of endangering."

During a subsequent interview, Elizabeth Clark, the assigned DYFS caseworker, drafted a case plan with Susan, which provided that John was to be appropriately supervised at all times. In her official reports, Clark indicated that DYFS had provided "no prior services to the family" and that the "case was at low risk level." Furthermore, she noted that "[n]o safety interventions were required," and her reports indicated "no negative issues" beyond the incident in question.

## B.

On April 27, 2007, DYFS substantiated the neglect allegation against Susan based upon inadequate supervision, *N.J.S.A.* 9:6–

---

[2] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

[3] Ordinarily Jim would drive Mary's mother, who spent weekends with the family in Atlantic Highlands, home to New York and then proceed to work. Although Susan, Mary, and Jim all maintain that Susan was unaware that Mary was going to New York that evening, Stone testified that at some point John said his grandparents had gone to New York.

8.21(c)(4)(b). Clark reached that finding "[b]ecause [John] was four years old and [was] left home without [Susan] securing proper child care arrangements." On May 15, 2007, Susan filed an appeal challenging the finding and the matter was referred to the OAL.

After a hearing, at which the aforementioned facts were established, the Administrative Law Judge (ALJ) concluded that Susan had made "an unfortunate mistake," but that DYFS did not prove "by a preponderance of the credible evidence that the physical, mental, or emotional condition of [Susan]'s child has been impaired or was in imminent danger of becoming impaired as a result of [Susan]'s failure to exercise a minimum degree of care pursuant to *N.J.S.A.* 9:6–8.21(c)." Thus, the ALJ recommended dismissal of the charges against her.

On March 30, 2009, the DYFS Director issued a Final Decision rejecting the ALJ's Initial Decision and reinstating DYFS's finding, which had substantiated child neglect against Susan.[4] The DYFS Director observed that Susan "failed to take the cautionary actions of supervision that are expected," and that the omission "exposed [John] to a substantial risk of harm." "Although [John] was not harmed during the incident, any number of dangers could have befallen [John] after he was left alone, especially taking into consideration his tender age. It is by mere fortunate happenstance that no actual harm befell this young child."

Susan appealed and, in an unpublished decision, the Appellate Division affirmed the Director's finding that Susan neglected John when she left him unsupervised.[5] The Appellate Division noted that the "minimum degree of care" standard articulated in *N.J.S.A.* 9:6–8.21(c)(4)(b) was addressed by this Court in *G.S. v. N.J. Div. of Youth & Family Servs.*, 157 *N.J.* 161, 723 *A.*2d 612

---

[4] The DYFS Director's Final Decision also provided that Susan's name would remain on the Child Abuse Registry, pursuant to *N.J.S.A.* 9:6–8.11.

[5] The Appellate Division also rejected Susan's challenges to her placement on the Child Abuse Registry.

(1999), and "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." (Quoting *id.* at 178, 723 A.2d 612). Given the deference owed to administrative agency decisions, the Appellate Division was satisfied that "sufficient credible evidence" existed in the record to "support the [DYFS] Director's finding that [Susan] failed to exercise the 'minimum degree of care' for [John]" when she left him home alone. The Appellate Division specifically disagreed with the ALJ's determination that Susan's actions amounted to merely an "unfortunate mistake"; instead, it concluded that Susan had placed John "at substantial risk of harm, by failing to ensure that her mother or step[-]father was at home" before leaving the house.

## II.

Susan maintains that her actions constituted an "isolated mistake" and that she did not act "purposefully and recklessly or in disregard for [John's] safety" when she left him alone, and that DYFS has not demonstrated that she presents a danger to children. Further, she contends that it is unfair to include her name on the Child Abuse Registry because there has been no demonstration that she is a danger to children.

In contrast, DYFS asserts that the Director's Final Decision should be affirmed because it was based on sufficient credible evidence in the record. Specifically, DYFS claims that "[t]here can be no question that [Susan] committed neglect when she left her four year old son alone when she went out to dinner without first assuring any childcare was in place." Although DYFS admits that Susan did not "intend[ ]" to put John in "harm's way," it argues that her conduct was "grossly or wantonly negligent." DYFS also contends that Susan's placement on the Child Abuse Registry is mandatory.

Amicus New Jersey Office of the Public Defender, Office of Parental Representation (OPR), argues that this "Court should reaffirm the broad principles *G.S.* established: specifically, that the definition of neglect excludes errors amounting to negligence,

carelessness or inadvertence when caring for a child, and that the censure of Title [Nine] is reserved for misconduct that amounts to recklessness or gross negligence." OPR argues that DYFS and the Appellate Division misconstrued what constitutes "minimum degree of care" under *G.S.* by equating simple inadvertence with recklessness, indifference, and gross negligence. For OPR, the Appellate Division decision "requires something akin to parenting perfection," and does not account for the limits of Title Nine. OPR further argues that, as a result, DYFS, as well as various Appellate Division panels, have improperly "conflate[d] mere consequence with sufficient conduct."

Amicus Legal Services of New Jersey (Legal Services) argues that *N.J.S.A.* 9:6–8.21(c)(4) creates a "problematic" dichotomy: to prove a child has been abused or neglected, DYFS must show under the statute either that the child's "physical, mental, or emotional condition has been impaired," or "is in imminent danger of becoming impaired." Legal Services asserts that DYFS did not address whether John "is in imminent danger," and instead focused on the various tragic outcomes that could have occurred. Accordingly, Legal Services asserts that DYFS did not carry its burden of demonstrating abuse or neglect under Title Nine. Finally, Legal Services argues that procedural due process is offended by including individuals on the Child Abuse Registry who do not pose a present or future threat to children.

### III.

### A.

In reviewing a final decision of a State administrative agency, we "must defer to an agency's expertise and superior knowledge of a particular field." *Greenwood v. State Police Training Ctr.*, 127 *N.J.* 500, 513, 606 *A.2d* 336 (1992). Thus, we are bound to uphold an agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." *In re Herrmann*, 192 *N.J.* 19,

27–28, 926 *A.*2d 350 (2007). However, we are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." *Mayflower Secs. Co. v. Bureau of Secs.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). "[I]f an agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent, no deference is required." *Reilly v. AAA Mid–Atl. Ins. Co. of N.J.*, 194 *N.J.* 474, 485, 946 *A.*2d 564 (2008) (quoting *In re N.J. Tpk. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 73*, 150 *N.J.* 331, 351, 696 *A.*2d 585 (1997)) (internal quotation marks omitted).

## B.

When we examine a statute, our "goal is to discern and effectuate the Legislature's intent. [Thus, t]he plain language of the statute is our starting point." *State v. Hupka*, 203 *N.J.* 222, 231, 1 *A.*3d 640 (2010) (quoting *Patel v. N.J. Motor Vehicle Comm'n*, 200 *N.J.* 413, 418, 982 *A.*2d 445 (2009)) (internal quotation marks omitted).

> We begin by "read[ing] and examin[ing] the text of the act and draw[ing] inferences concerning the meaning from its composition and structure." 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 47:1 (7th ed.2007).
>
> . . .
>
> If a plain-language reading of the statute "leads to a clear and unambiguous result, then our interpretive process is over. Only if there is ambiguity in the statutory language will we turn to extrinsic evidence. When such evidence is needed, we look to a variety of sources. Central among them is a statute's legislative history." *Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 192 *N.J.* 189, 195–96, 927 *A.*2d 543 (2007) (citations omitted).
>
> [*Id.* at 231–32, 1 *A.*3d 640.]

*See also N.J.S.A.* 1:1–1 ("In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their

generally accepted meaning, according to the approved usage of the language.").

## IV.

With those principles in mind, we turn to the statute. "Title [Nine of the New Jersey Statutes] controls the adjudication of abuse and neglect cases." *N.J. Div. of Youth & Family Servs. v. M.C. III*, 201 *N.J.* 328, 343, 990 *A*.2d 1097 (2010) (citing *N.J.S.A.* 9:6–8.21 to –8.73). As we stated in *N.J. Div. of Youth & Family Servs. v. P.W.R.*, 205 *N.J.* 17, 31, 11 *A*.3d 844 (2011):

The purpose animating Title Nine "is to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them." *N.J.S.A.* 9:6–8.8; *see* [*G.S., supra,* 157 *N.J.* at 177, 723 *A*.2d 612] ("Title [Nine]'s primary concern is the protection of children, not the culpability of parental conduct." (citation omitted)); *cf.* S. 1217 (Sponsor's Statement), 196th Leg. (N.J.1974) (declaring that children have "the right of protection from physical abuse and neglect" and that purpose of Title Nine is to ensure children's "rights will be adequately protected by the appropriate courts and social service agencies").

*N.J.S.A.* 9:6–8.21(c)(4)(b), which is the provision at issue here, defines "abused or neglected child" as:

a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care ... (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court ...

The main bone of contention in this case is the "failure ... to exercise a minimum degree of care" language.

## A.

In *G.S.*, we addressed that language in the context of "a medication overdose administered to a child by a caregiver at a facility for retarded persons[, the Association for Retarded Citizens (ARC) ]." *G.S., supra,* 157 *N.J.* at 166–67, 723 *A*.2d 612. G.S. was a coordinator, "responsible for administering the medication brought by parents" to ARC. *Id.* at 167, 723 *A*.2d 612. N.D., an autistic, developmentally-disabled, non-verbal child, was dropped

off by his mother. *Ibid.* Before leaving, she gave an ARC worker "a bottle [of] Clonidine, an anti-hyperactive drug," for N.D. and told the worker "that it was a new medication and that she had 'crushed it' already." *Ibid.* The ARC worker "immediately brought the vial to G.S. and repeated" the instructions. *Ibid.* When it was time to administer the medicine, G.S. discovered the pills were all broken. *Id.* at 168, 723 *A.*2d 612. The instructions on the bottle read "one-half a pill, increasing the dosage as needed." *Ibid.* Because no whole pills were in the bottle, G.S. could not tell how big one pill was. *Ibid.* Without attempting to clarify the situation, G.S. gave N.D. the entire bottle. *Ibid.* N.D.'s mother learned what had happened when she arrived to get her son who was, by then, semi-conscious, and immediately rushed him to the hospital where he was admitted for a drug overdose.[6] *Ibid.* A subsequent DYFS investigation concluded that G.S.'s conduct "constituted neglect." *Id.* at 169, 723 *A.*2d 612.

On appeal, the Appellate Division reversed, concluding that accidentally-caused injuries "could not support a finding of child neglect under *N.J.S.A.* 9:6–8.21." *Ibid.* The Appellate Division reasoned that "[d]espite the 'persuasive evidence [indicating] that G.S. [had] violated [ARC's] clear mandated policies with respect to the administration of medications,' [DYFS] found no evidence that G.S.'s conduct was 'other than accidental.' " *Id.* at 169–70, 723 *A.*2d 612. Indeed, the Appellate Division viewed DYFS's interpretation as equating mere negligence with neglect, contrary to the legislative scheme. *Id.* at 170, 723 *A.*2d 612. DYFS filed a petition for certification that we granted, *G.S. v. N.J. Div. of Youth & Family Servs.*, 153 *N.J.* 215, 708 *A.*2d 66 (1998), ultimately reversing. *G.S., supra,* 157 *N.J.* at 183, 723 *A.*2d 612.

We began our analysis by addressing the provisions of Title Nine relative to "other than accidental means," which we held inapplicable to section (c)(4)(b):

---

[6] Although N.D. did not suffer any permanent harm, he did remain in the hospital for forty-eight hours. *Id.* at 168, 723 A.2d 612.

In concluding that accidental injuries cannot form the basis for a finding of neglect, the Appellate Division ignored the plain language of section (c)(4)(b) and erroneously interpreted the meaning of the phrase "other than accidental means." Nothing in the plain language of *N.J.S.A.* 9:6–8.21(c)(4)(b) compels the conclusion that accidental injuries cannot form the basis for a finding of neglect under that provision. The clear and unambiguous language of *N.J.S.A.* 9:6–8.21(c)(4)(b) makes no reference to the accidental or non-accidental nature of the injury. "[W]here the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *Alan J. Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 234, 708 *A.*2d 401 (1998). Had the Legislature intended section (c)(4)(b) to be limited to "injuries caused by other than accidental means," it would have said so explicitly, as it did in the other two sections. A simple reading of *N.J.S.A.* 9:6–8.21(c)(4)(b) supports the conclusion that accidentally-caused injuries can form the basis for a finding of neglect under that section.

[*Id.* at 173, 723 *A.*2d 612.]

In particular, in connection with the notion of "failure ... to exercise a minimum degree of care," we said:

G.S. argues that she did not fail to exercise a minimum degree of care because her actions were inadvertent and she did not intend to harm N.D. She contends that New Jersey law requires a guardian to act with a willful or purposeful intent to commit child abuse. DYFS, on the other hand, urges us to conclude that the standard announced in *N.J.S.A.* 9:6–8.21 is a simple negligence standard. DYFS argues that a guardian can fail to exercise a minimum degree of care even though he or she does not specifically intend to harm the child.

We do not agree with either party's interpretation of the standard of care under *N.J.S.A.* 9:6–8.21(c)(4)(b). If the Legislature intended DYFS and the courts to apply an "intent" standard, it would have stated so explicitly. Similarly, if the Legislature intended to codify a negligence standard, it would have used the phrase "failure to exercise reasonable care." *See* [*Chase Manhattan Bank v. Josephson,* 135 *N.J.* 209, 227, 638 *A.*2d 1301 (1994) ] (recognizing that courts presume that Legislature is familiar with existing judicial interpretation). We think the phrase "failure to exercise a minimum degree of care" was chosen to capture a middle standard.

The phrase "minimum degree of care" denotes a lesser burden on the actor than a duty of ordinary care. If a lesser measure of care is required of an actor, then something more than ordinary negligence is required to hold the actor liable. *The most logical higher measure of neglect is found in conduct that is grossly negligent because it is willful or wanton. Therefore, we believe the phrase "minimum degree of care" refers to conduct that is grossly or wantonly negligent, but not necessarily intentional. See* [*Miller v. Newsweek,* 660 *F.Supp.* 852, 858–59 (D.Del. 1987) ].

[*Id.* at 177–78, 723 *A.*2d 612 (emphasis added).]

We went on to define our terms:

As our previous cases have recognized, the difference between merely negligent conduct and wanton and willful misconduct cannot be described with mathematical

precision. [*McLaughlin v. Rova Farms, Inc.*, 56 *N.J.* 288, 305, 266 *A.*2d 284 (1970)]. "Like many legal characterizations, willful misconduct is not immutably defined but takes its meaning from the context and purpose of its use." *Fielder v. Stonack*, 141 *N.J.* 101, 124, 661 *A.*2d 231 (1995). The label turns on an evaluation of the seriousness of the actor's misconduct. *McLaughlin, supra*, 56 *N.J.* at 306, 266 *A.*2d 284. Although it is clear that the phrase implies more than simple negligence, it can apply to situations ranging from "slight inadvertence to malicious purpose to inflict injury." *Id.* at 305 [266 *A.*2d 284]; *Krauth v. Israel Geller and Buckingham Homes, Inc.*, 31 *N.J.* 270, 277 [157 *A.*2d 129] (1960) (stating wantonness is an advanced degree of negligent misconduct).

Essentially, the concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others. *Fielder, supra*, 141 *N.J.* at 123 [661 *A.*2d 231]; *McLaughlin, supra*, 56 *N.J.* at 305 [266 *A.*2d 284]. Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes. *Ibid.* Thus, under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of her actions, regardless of whether she actually intended to cause injury.

[*Id.* at 178–79, 723 *A.*2d 612.]

Obviously there was some imprecision in our expression of the standard in *G.S.* (e.g., "wanton and willful negligence") however, the leitmotif that shines through the opinion is that, "failure ... to exercise a minimum degree of care" at least requires grossly negligent or reckless conduct.

We concluded:

Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation. We recognize that a variety of factual scenarios can give rise to the finding that a guardian has failed to exercise a minimum degree of care, and do not attempt to describe them. We simply remind DYFS and the courts that the inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger. When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law. Ultimately, we leave it to DYFS and the courts to determine, on a case-by-case basis, whether a caregiver has failed to exercise a minimum degree of care in protecting a child.

[*Id.* at 181–82, 723 *A.*2d 612.]

As is obvious, the "cautionary act" language in *G.S.* is informed by the grossly negligent or reckless standard that that case established. In other words, every failure to perform a cautionary act is not abuse or neglect. When the failure to perform a

cautionary act is merely negligent, it does not trigger section (c)(4)(b) of the abuse or neglect statute.

That focus on the parent's level of culpability in assessing a "minimum degree of care" language is in synchronicity with the Legislature's expressed purpose to safeguard children. Indeed, where a parent or guardian acts in a grossly negligent or reckless manner, that deviation from the standard of care may support an inference that the child is subject to future danger. To the contrary, where a parent is merely negligent there is no warrant to infer that the child will be at future risk.

Over a decade has passed since our decision in *G.S.* In that time, the Legislature has taken no action to alter or amend the language of section (c)(4)(b). We take it from that acquiescence that our interpretation of the statute is consonant with the legislative scheme. *See State v. Chapland,* 187 *N.J.* 275, 291, 901 *A.*2d 351 (2006); *Tlumac v. High Bridge Stone,* 187 *N.J.* 567, 573, 902 *A.*2d 222 (2006); *Asbury Park Press, Inc. v. City of Asbury Park,* 19 *N.J.* 183, 190, 115 *A.*2d 564 (1955) (construction of statute by courts "supported by long acquiescence on the part of Legislature, or by continued use of same language ... is evidence that such construction is in accordance with the legislative intent." (quoting *Barringer v. Miele,* 6 *N.J.* 139, 144, 77 *A.*2d 895 (1951) (internal quotation marks omitted))).

## B.

The Appellate Division has also had an opportunity to interpret the abuse or neglect statute in light of *G.S.* and its discussions shed light on what is before us. In *N.J. Div. of Youth & Family Servs. v. A.R.,* 419 *N.J.Super.* 538, 17 *A.*3d 850 (App.Div.2011), a father put his ten-month-old son "on a twin bed without rails" next to a radiator and "closed the door behind him." *Id.* at 545–46, 17 *A.*3d 850. The child was treated for third-degree burns, described as being "all the way down to his skull." *Id.* at 541, 17 *A.*3d 850. At a hearing to determine abuse or neglect, the trial judge

concluded that the father "was not grossly negligent," but "exercised very poor judgment." *Ibid.*

On interlocutory review, the Appellate Division reversed. *Id.* at 540, 17 *A.*3d 850. The Appellate Division began by properly rejecting the contention that the trial judge's findings are entitled to deference: "[t]he facts presented by [DYFS] were undisputed, and the judge's determination that [the father] was negligent but not grossly negligent is a conclusion of law to which we are not required to defer." *Id.* at 542–43, 17 *A.*3d 850. Reversing the trial court's determination, the Appellate Division reasoned that the father's positioning of blankets on the bed to create a buffer for the child demonstrated that he actually "recognized the inherent danger to the ten-month old child in sleeping on a bed without rails near a radiator." *Id.* at 546, 17 *A.*3d 850. Accordingly, the Appellate Division concluded that " 'an ordinary reasonable person' would understand the perilous situation in which the child was placed, and for that reason, [the father]'s conduct amounted to gross negligence." *Ibid.*

In *N.J. Department of Youth & Family Servs. v. J.L.*, 410 *N.J.Super.* 159, 980 *A.*2d 488 (App.Div.2009), the *G.S.* standard was applied with a different outcome. There, the mother of a three-year old and a five-year old allowed them to walk from a playground to their home while she remained at the playground. *Id.* at 161, 980 *A.*2d 488. The playground was situated in a condominium complex where the family lived, and was "clearly" visible from where the mother was standing. *Ibid.* Although the mother had trained the children to leave the door—"equipped with a child-proof cover"—ajar if they entered without her, on that occasion, the door closed behind the children and locked them inside the house. *Id.* at 161–62, 980 *A.*2d 488. Shortly thereafter, they called 9–1–1 and the police arrived and opened the door. *Id.* at 162, 980 *A.*2d 488. It appeared to the officer the children had been crying, but were otherwise "o.k." *Ibid.* Approximately thirty minutes after her son's 9–1–1 call, the mother returned home, and was informed by the officer that DYFS would be contacted. *Ibid.*

The caseworker in *J.L.* substantiated a finding of neglect, but determined that the children were at no further risk. *Id.* at 163, 980 *A.*2d 488. The ALJ assigned to the appeal found that the mother's conduct fell "well shy" of the standard of neglect articulated in *G.S. Id.* at 165, 980 *A.*2d 488. Nevertheless, the DYFS Director affirmed the finding of neglect. *Ibid.* In reversing, the Appellate Division stated that the mother's conduct, "although arguably inattentive or even negligent," did not meet the requisite standard contemplated by *G.S. Id.* at 168, 980 *A.*2d 488.

What can be gleaned from those cases is that the question of whether a particular event is to be classified as merely negligent, grossly negligent, or reckless can be a difficult one. *See A.R., supra,* 419 *N.J.Super.* at 544, 17 *A.*3d 850 (quoting *G.S., supra,* 157 *N.J.* at 178, 723 *A.*2d 612) (noting question not answerable with "mathematical precision"). There exists a continuum between actions that are grossly negligent and those that are merely negligent. The parent's conduct must be evaluated in context based on the risks posed by the situation. *G.S., supra,* 157 *N.J.* at 181–82, 723 *A.*2d 612. The cases are fact-sensitive. A parent who looks away for a moment in a playground may be negligent, but that is not what the Legislature intended to interdict by the "failure ... to exercise a minimum degree of care" language in section (c)(4)(b).

## V.

This is a close case. However, applying the aforementioned standards, we have concluded that, although Susan was plainly negligent, she was not grossly negligent or reckless in the actions that led us here. This is not a situation in which she left her four-year-old son at home alone knowing there was no adult supervision. Instead, Susan, who lived with her parents and is intimately familiar with the rhythms of their every-day-family-life, arrived at her home on a Sunday night and saw her mother's car in the driveway. She knew that her mother was always home on Sunday nights to prepare for work on Monday morning. In

addition, she knew her mother had been ill all week with the flu. Further, her mother and step-father both attested to their weekly Sunday routine: that Susan's mother is always home on Sunday nights and that the trip to New York was unexpected. Ordinarily, Susan's mother would remain home alone, with her car in the driveway while the step-father went to work. What occurred on the date in question was totally out of the ordinary. To be sure, Susan's failure to perform the cautionary act of calling upstairs to assure her mother's presence was clearly negligent. Under all of the circumstances known to her however, it did not rise to the level of gross negligence or recklessness. Because we have found that Susan's conduct did not constitute a failure to "exercise a minimum degree of care," we do not reach the question of "impairment." Nor are we required to address the due process issues raised in connection with the Child Abuse Registry because Susan's name will no longer be recorded there.

## VI.

The judgment of the Appellate Division is reversed. The matter is remanded to the DYFS Director for removal of Susan's name from the Child Abuse Registry.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO and HOENS—6.

*Opposed*—None.