RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1223-15T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

B.D.,

 Defendant-Appellant.
________________________________

IN THE MATTER OF M.D. and A.D.,

 Minors.
________________________________

 Submitted March 15, 2017 – Decided September 29, 2017

 Before Judges Carroll and Gooden Brown.

 On appeal from the Superior Court of New
 Jersey, Chancery Division, Family Part, Essex
 County, Docket No. FN-07-0544-14.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Laura M. Kalik, Designated
 Counsel, on the briefs).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Andrea M. Silkowitz,
 Assistant Attorney General, of counsel; Mary
 L. Harpster, Deputy Attorney General, on the
 brief).
 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minor M.D. (Catherine
 Davila, Designated Counsel, on the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minor A.D. (Cory H.
 Cassar, Designated Counsel, on the brief).

GOODEN BROWN, J.A.D.

 Defendant B.D.1 appeals from the November 7, 2014 Family Part

order2 finding that he abused or neglected his then twelve-year-

old daughter, M.D., within the meaning of N.J.S.A. 9:6-8.21(c).

Defendant argues that the evidence presented at the fact-finding

hearing was insufficient to support the trial court's finding of

abuse or neglect under Title 9. The Division of Child Protection

and Permanency (Division) and M.D.'s Law Guardian join in opposing

the appeal. Although there was no finding of abuse or neglect

with respect to M.D.'s then nine-year-old sister, A.D., who is not

a party to this appeal, A.D.'s Law Guardian filed a brief taking

no position.3 Having considered the parties' arguments in light

of the record and applicable legal principles, we affirm.

1
 Pursuant to Rule 1:38-3, we use initials for the parties to
protect their identities.
2
 This order became appealable as of right after the trial court
entered a final order terminating the litigation on September 30,
2015.
3
 Although there was no finding of abuse or neglect regarding A.D.,
A.D. was included in the fact-finding order and was under the care

 2 A-1223-15T4
 We derive the following facts from the record developed at

the fact-finding hearing, during which Newark Police Officer

Derrick Clemons and Division Caseworker Martha Harris testified

for the Division. Salima Gordon, a Community Engagement Specialist

at the children's school, and A.D. testified for defendant. The

Division's Screening and Investigation Reports, the police report,

M.D.'s medical records, and photographs of M.D.'s injuries were

admitted into evidence.

 At approximately 9:00 a.m. on April 24, 2014, Officer Clemons

responded to Sherman Street in Newark after a bystander reported

finding M.D. crying, bleeding and limping. M.D. reported to

Clemons that defendant struck her several times during a physical

altercation, after he accused her of stealing $25 from him.

According to M.D., after the altercation, defendant went back to

work and M.D. was walking to school when she encountered the

bystander on the street.

 Clemons observed injuries to M.D.'s head and hands,

specifically swelling, cuts and bruises. Clemons contacted

Emergency Medical Services personnel, who transported M.D. to Beth

Israel Hospital for treatment of her injuries. In addition, a

child abuse referral was made to the Division. While M.D. was

and supervision of the Division when the fact-finding hearing was
conducted.

 3 A-1223-15T4
being treated, Clemons was notified that defendant was at police

headquarters attempting to file a complaint against M.D. Clemons

returned to headquarters and placed defendant under arrest for

aggravated assault and child endangerment based on M.D.'s

statement. At the time, defendant was unaware that M.D. had been

transported to the hospital.

 Upon receiving the child abuse referral, Harris interviewed

M.D. at Beth Israel Hospital where M.D. repeated the account she

gave Clemons. M.D. specified that defendant punched her with a

closed fist. M.D. also told Harris that during a prior incident,

defendant "beat her up" when she arrived home late from

cheerleading practice, but indicated she did not have any marks

or bruises from that incident. During the interview, Harris

observed abrasions on M.D.'s left elbow, left hand, left index

finger, and left thumb, which she later photographed. The

attending medical personnel noted that the abrasions were

consistent with M.D.'s statement of being assaulted. It was

further noted that the degree of pain was "moderate[,]" and the

degree of bleeding was "minimal." A follow-up with her primary

care physician was recommended.

 Harris then traveled to Peshine Avenue School in order to

interview A.D. about the incident. A.D. denied seeing defendant

hit M.D. and denied seeing M.D. get hurt. A.D. confirmed that

 4 A-1223-15T4
defendant and M.D. argued over the missing money that M.D. had,

in fact, stolen from defendant but "pleaded with [A.D.] not to

tell." A.D. stated that because M.D. was angry at defendant, M.D.

punched a hole in the living room wall. In addition, when they

headed out to the car to go to school, M.D. took a rock and threw

it at defendant, and then proceeded to bang on the car window with

the rock.

 A.D. told Harris that defendant left M.D. and drove her to

school, only after M.D. refused to get her book bag so that he

could take her to school. When questioned about the prior incident

involving M.D. arriving home late from cheerleading practice,4 A.D.

admitted that defendant and M.D. argued, but denied any corporal

punishment. Instead, M.D.'s punishment "was no TV, no phone and

[M.D.] had to stay home all day." A.D. told Harris that M.D. was

"very disrespectful" to their father and "tries to break the

rules."

4
 Gordon testified for defendant and reported that M.D. signs up
for various after school programs but never attends, requiring
staff to wait for M.D. to return to pick up A.D. Although Gordon
did not know M.D.'s whereabouts when she absented herself from the
after school programs, she confirmed that M.D. was not on the
school premises.

 5 A-1223-15T4
 Harris returned to Beth Israel Hospital and accompanied M.D.

home in order to effectuate a DODD removal5 of both M.D. and A.D.,

who was then home from school. While they were at the home, M.D.

changed her account of how she was injured. She told Harris that

her injuries were actually sustained during an altercation with

defendant that occurred outside. According to M.D., while they

were outside, defendant tried to get her into his car. However,

based on prior beatings, she was afraid and tried to run away from

him, at which point defendant pushed her and she fell to the

ground. While she was on the ground, defendant tried to get her

house keys from her book bag and a scuffle ensued.

 A.D. became extremely angry and upset when she heard M.D.'s

account of how she was injured and learned that they would be

removed as a result. When Harris explained the removal process

to them, A.D. argued with M.D. in Harris' presence and blamed M.D.

for their removal and their father's arrest. A.D. indicated that

"it was [M.D.'s] fault" because "[s]he was being disrespectful"

and "threw a rock at her father, and that's why they got into the

argument." M.D. explained that she threw the rock because she was

5
 A "Dodd" removal refers to the emergency removal of a child from
the home without a court order, pursuant to the Dodd Act, N.J.S.A.
9:6-8.21 to -8.82, as amended.

 6 A-1223-15T4
angry at defendant for "dragg[ing] her back inside" and "[telling]

her to walk to school" because "nobody cared about her."

 Harris interviewed defendant on April 246 and again on May 1,

2014. Defendant admitted that he and M.D. argued over the missing

money, but denied punching or pushing her. He stated that she ran

away from him while he was trying to talk to her and she tripped

and fell. He admitted attempting to take her house keys out of

her book bag while she was on the ground because she had threatened

to have her friends take everything in the house, a threat M.D.

admitted making. After the scuffle on the ground, defendant tried

to get M.D. into his car to take her to school, but she refused.

As a result, he left her and took A.D. to school, and later went

to the police station to report the stolen money. He acknowledged

he did not return to the house to check on M.D. He explained that

M.D. had been "acting out[]" and was "disrespectful."

 Because there was no prior history involving the family,

following the investigation, the Division determined that the

allegations of abuse or neglect were established. While M.D.'s

credibility was questioned based on the inconsistencies in her

6
 The main purpose of the April 24, 2014 interview was to ascertain
the identity of any family members or friends who would be willing
to care for the children. However, M.D.'s mother was reportedly
in the Ivory Coast, and the individuals identified by defendant
were not viable placement options.

 7 A-1223-15T4
accounts, it was determined that defendant was "an active

participant" in the altercations that resulted in M.D.'s injuries.

 A.D. testified in-camera at the fact-finding hearing pursuant

to Rule 5:12-4(b). Although she acknowledged that there were two

separate incidents, one inside the house and one outside, she

again denied that defendant "hit[,]" "punched[,]" pushed or

injured M.D. in any way, and claimed that on both occasions,

"[M.D.] fell by herself. So she hurt her own self." A.D. admitted

being upset about their removal and blaming M.D. She also

explained that defendant normally disciplined M.D. by "talk[ing]

to her" but "she [doesn't] want to listen."

 Following the hearing, the court determined that the Division

"met its burden" and proved "by a preponderance of the evidence"

that M.D. was abused and neglected. The court found the testimony

of the police officer and the caseworker credible, and that the

injuries they observed and described were consistent with and

"match[ed] up with what [M.D.] said." On the other hand, the

court discredited A.D.'s testimony, noting

 we have [A.D.'s] testimony who said she fell
 twice, once in the house, once outside. . . .
 I didn't find it really credible. And,
 obviously, she's living with the father. She
 was somewhat upset that [M.D.'s] behavior led
 to her removal and this incident. And,
 clearly, I think she blamed [M.D.] But,
 regardless, I think . . . at her age[,] . . .

 8 A-1223-15T4
 her testimony could very well have been
 manipulative.

 Or, alternatively, she originally said
 she didn't see anything to the caseworker. I
 don't know if she saw anything or not. But
 now she did see something and she fell twice.
 I mean the story just didn't match up. It
 doesn't make any sense what [A.D.] said.

 Further, the court explained "we have no testimony by the

defendant denying these allegations or explaining what happened

or why he would take off and leave his daughter crying and

bleeding." The court concluded that "there were injuries sustained

by [M.D.] due to the actions of [defendant], [who] was apparently

upset over some $25 that [M.D.] may have taken." According to the

court, "whether she took the money or not is really irrelevant for

purposes of this hearing. The question is, how the defendant

. . . dealt with that issue[.]" The court determined that the

precipitating event was "really not . . . a justification for

hitting the child or injuring the child[.]" The court entered a

memorializing order, and this appeal followed.

 Our Supreme Court has set forth the standard that governs

Title 9 cases as follows:

 [A]ppellate courts defer to the factual
 findings of the trial court because it has the
 opportunity to make first-hand credibility
 judgments about the witnesses who appear on
 the stand; it has a feel of the case that can
 never be realized by a review of the cold
 record . . . . [B]ecause of the family courts'

 9 A-1223-15T4
 special jurisdiction and expertise in family
 matters, appellate courts should accord
 deference to family court factfinding.

 [N.J. Div. of Youth & Family Servs. v. M.C.
 III, 201 N.J. 328, 342-43 (2010) (citations
 omitted).]

 Thus, "if there is substantial credible evidence in the record

to support the trial court's findings, we will not disturb those

findings." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J.

210, 226 (2010). However, "if the trial court's conclusions are

'clearly mistaken or wide of the mark' [we] must intervene to

ensure the fairness of the proceeding." Id. at 227 (quoting N.J.

Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

We owe no deference to the trial court's legal conclusions, which

we review de novo. N.J. Div. of Youth & Family Servs. v. A.R.,

419 N.J. Super. 538, 542-43 (App. Div. 2011).

 "To prevail in a Title 9 proceeding, the Division must show

by a preponderance of the competent and material evidence that the

defendant abused or neglected the affected child." N.J. Div. of

Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 380 (App.

Div. 2014); see N.J.S.A. 9:6-8.46(b). The trial court in turn

determines whether the child is abused or neglected by "the

totality of the circumstances." Dep't of Children & Families v.

G.R., 435 N.J. Super. 392, 401 (App. Div. 2014). An "abused or

 10 A-1223-15T4
neglected child" means, in pertinent part, a child under the age

of eighteen years

 whose physical, mental, or emotional condition
 has been impaired or is in imminent danger of
 becoming impaired as the result of the failure
 of [the] parent or guardian . . . to exercise
 a minimum degree of care . . . in providing
 the child with proper supervision or
 guardianship, by unreasonably inflicting or
 allowing to be inflicted harm, or substantial
 risk thereof, including the infliction of
 excessive corporal punishment; or by any other
 acts of a similarly serious nature requiring
 the aid of the court[.]

 [N.J.S.A. 9:6-8.21(c)(4)(b).]

 Interpreting N.J.S.A. 9:6-8.21(c)(4)(b), our Supreme Court

has held that mere negligence does not trigger the statute. N.J.

Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 306-07 (2011);

G.S. v. Dep't of Human Servs., 157 N.J. 161, 172-73 (1999).

Rather, the failure to exercise a minimum degree of care refers

"to conduct that is grossly or wantonly negligent, but not

necessarily intentional." T.B., supra, 207 N.J. at 305 (quoting

G.S., supra, 157 N.J. at 178). Thus, the failure to exercise a

minimum degree of care "at least requires grossly negligent or

reckless conduct." T.B., supra, 207 N.J. at 306.

 Although the distinction between gross negligence and

ordinary negligence cannot be precisely defined, McLaughlin v.

Rova Farms, Inc., 56 N.J. 288, 305 (1970), the essence of gross

 11 A-1223-15T4
or wanton negligence is that it "implies that a person has acted

with reckless disregard for the safety of others." G.S., supra,

157 N.J. at 179. Further, willful or wanton conduct is "done with

the knowledge that injury is likely to, or probably will,

result[,]" and "can apply to situations ranging from 'slight

inadvertence to malicious purpose to inflict injury.'" Id. at 178

(quoting McLaughlin, supra, 56 N.J. at 305). If the act or

omission is intentionally done, "whether the actor actually

recognizes the highly dangerous character of [his or] her conduct

is irrelevant," and "[k]nowledge will be imputed to the actor."

Ibid. Such knowledge is imputed "[w]here an ordinary reasonable

person would understand that a situation poses dangerous risks and

acts without regard for the potentially serious consequences[.]"

Id. at 179.

 A determination of whether a parent's conduct "is to be

classified as merely negligent, grossly negligent, or reckless can

be a difficult one." T.B., supra, 207 N.J. at 309. The

determination is fact sensitive and "[e]ach case requires careful,

individual scrutiny" as many cases are "idiosyncratic." N.J. Div.

of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011).

However, because the primary purpose is the protection of children,

our Supreme Court has explained that "a Title 9 inquiry must focus

on the circumstances leading up to the injury and on the harm to

 12 A-1223-15T4
the child, and not on the [parent or] guardian's intent." G.S.,

supra, 157 N.J. at 176. Thus, "whether the [parent or] guardian

intended to harm the child is irrelevant[,]" and when "a parent

or guardian commits an intentional act that has unintended

consequences, that action is considered other than accidental

within the meaning of Title 9." Ibid.

 In M.C. III, supra, 201 N.J. at 335, a two-hundred pound

father chased his two teenage children, caught and grabbed them,

and all three ended up on the floor. Both children were injured.

One child had a soft tissue injury to his right hand, scratches

on his neck, and abrasions and swelling over his ribs, while the

other had rib tenderness and an abrasion behind her ear. Ibid.

Our Supreme Court held that, although the father "may not have

intended to harm his children, his actions were deliberate" and

constituted abuse because he "intentionally grabbed the children

and disregarded the substantial probability that injury would

result from his conduct." Id. at 345.

 Similarly, defendant's conduct in this case constituted abuse

or neglect within the meaning of Title 9. Even focusing solely

on the scuffle on the ground to which defendant admitted, while

he may not have intended to harm M.D., his actions were deliberate

and constituted abuse because he disregarded the substantial

probability that injury would result from his conduct. We are

 13 A-1223-15T4
therefore satisfied that the court's findings are supported by

substantial, competent, and credible evidence in the record.

 Defendant also argues that the court "misapplied the law by

relying upon M.D.'s out-of-court statements to find that

[defendant] had committed abuse or neglect under Title 9." We

disagree. Pursuant to N.J.S.A. 9:6-8.46(a)(4), "previous

statements made by the child relating to any allegations of abuse

or neglect shall be admissible in evidence; provided, however,

that no such statement, if uncorroborated, shall be sufficient to

make a fact finding of abuse or neglect." Thus, a child's

uncorroborated hearsay statement, although admissible, "may not

be the sole basis for a finding of abuse or neglect." P.W.R.,

supra, 205 N.J. at 33; see also N.J. Div. of Youth & Family Servs.

v. L.A., 357 N.J. Super. 155, 167 (App. Div. 2003). In N.J. Div.

of Child Prot. & Permanency v. J.A., 436 N.J. Super. 61, 67 (App.

Div. 2014), we held that "corroborative evidence need not be direct

so long as it provides some support for the out-of-court

statements." Here, M.D.'s statements were sufficiently

corroborated by the police officer's and the caseworker's

observations and descriptions of M.D.'s injuries, the photographs

of M.D.'s injuries, and M.D.'s medical records.

 Affirmed.

 14 A-1223-15T4