**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2862-16T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

R.O.,

    Defendant-Appellant,

and

J.C.,

    Defendant.

_____

IN THE MATTER OF L.C., a minor.

_____

        Submitted January 22, 2018 — Decided August 24, 2018

        Before Judges Ostrer and Whipple.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Middlesex
        County, Docket No. FN-12-0297-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Lauren Derasmo, Designated
        Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Joshua Bohn, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor L.C. (Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant R.O. (Rachel)[1] appeals from the Family Part's January 27, 2017, final order, following a fact-finding hearing, determining that she abused or neglected her then two-year-old daughter, L.O. (Laura). The court concluded that Rachel was "grossly negligent," by failing to supervise her daughter "for a minimum of forty minutes." While Rachel was behind her bedroom's closed door, Laura bypassed a child-safety gate in the living room, opened the exterior door, slipped through a gap in the backyard fence, and wandered the street until a neighbor found her. Although Rachel's actions were no doubt negligent, they were not "grossly or wantonly negligent." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). Therefore, we reverse.

I.

The Division of Child Protection and Permanency presented its case through three witnesses: the neighbor who found Laura, one

---

[1] For the reader's convenience, we use pseudonyms for defendant, her daughter, and her daughter's father.

of the responding police officers, and the Division caseworker. The Division also introduced into evidence a redacted version of the caseworker's investigative summary, a Google map of the neighborhood where Laura lives and was found, and the police report. The Law Guardian and Rachel did not present any witnesses.

The neighbor testified that while on her way to work on a late afternoon in April, she spotted Laura walking alone in the middle of an internal roadway of the mobile home community. She was dressed in one-piece pajamas with "feet." The neighbor stopped her car about seventy-five feet from the child. As the neighbor started toward Laura, she ran away toward an intersection with another road, which in turn led to Route 1. At that point, Laura was 200 to 250 feet from her home, according to the officer.

The neighbor testified she saw a pick-up truck about 100 feet from Laura. She said the driver stopped "in front" of the child, and blew his horn. Laura halted, and the neighbor scooped up the child. She described Laura's face as red and "mucusy" but she was not crying. Laura could not communicate where she lived. After searching for Laura's parents for about seven minutes, the neighbor left Laura with another neighbor in the community, whom she believed worked for the Division, and then left for work. That second neighbor called the police, which dispatched officers at 4:32 p.m.

A-2862-16T1

The responding patrol officer testified that his sergeant recognized the child from a previous first-aid call. Laura was playful and appeared unharmed. This was confirmed by EMTs who subsequently arrived on the scene. The patrol officer proceeded down the block with Laura to Rachel's home, arriving at 5:07 p.m. When Rachel responded to the door, she was unaware why the police were there. She became hysterical after the officer informed her that Laura was found near Route 1.

Rachel told the officer that she was in the back bedroom with the door shut, talking on the phone. The bedroom door opened to a kitchen which was not separated by a doorway from the adjoining living room. Rachel had erected a baby safety gate to keep Laura in the living room. However, the officer testified, "It appeared she maneuvered past the gate and then exited the back door that's in the kitchen and then once in the backyard there's fencing missing and it appeared she went through there."

The officer detected a strong odor of marijuana. He entered the apartment and saw marijuana and paraphernalia in plain view. Rachel explained that Laura's father, J.C. (Jack), had smoked the marijuana before leaving for work. The officer testified that Rachel did not appear to be under the influence of drugs. Once Rachel informed Jack what happened, he sent his parents to the

house.  He arrived soon after and took responsibility for the marijuana.

The caseworker testified that she arrived at the home around 6:30 p.m.  In her interview, Rachel disclosed she had just returned that day from a week of residential drug treatment.  After Jack left for work at 3:45 p.m., Rachel set Laura up with a movie in the living room, secured the baby gate, and proceeded to make some phone calls in her bedroom.  She closed the door because she was smoking a cigarette and did not want Laura exposed to the smoke.

The caseworker testified that the Division found it "established" that Rachel neglected Laura based on inadequate supervision.  The Division found two mitigating factors: (1) there was no physical, psychological, or emotional impact due to Rachel's inadequate supervision, and (2) it was an isolated or aberrational incident.

The fact-finding hearing focused on the precautions Rachel took, or failed to take, to assure Laura's safety.  Rachel had installed the baby gate between the living room wall and sofa. The caseworker asserted, based on her own test, that the gate was not securely attached, because of the sofa's soft surface.  There was also some uncertainty about whether Laura toppled the gate, or squeezed around it somehow.  The officer did not testify about the position of the gate when he arrived.  He testified that Laura

had maneuvered around it. However, according to the investigative summary, Rachel told the caseworker "[She] . . . heard the knocking on the door; and as she left her bedroom she noticed that [t]he gate was down on the floor."

Rachel also claimed, in her interview with the caseworker, that she monitored Laura from the bedroom every ten minutes with a "nanny cam." Neither the caseworker nor the officer spotted the nanny cam in the apartment, but they did not confidently assert it did not exist. In any event, Rachel could not have seen Laura on the nanny cam for at least forty-two minutes — consisting of the seven minutes it took the first neighbor to deliver Laura to the second neighbor, plus the thirty-five minutes between the police dispatch, and their arrival at Rachel's home. Rachel told the caseworker that while she was in the bedroom, she made a fifteen-minute call to her sister, and a twenty-minute call to her father.

The hearing also addressed the foreseeability of Laura's exploits. According to the investigative summary, Rachel told the caseworker that "[Laura] . . . never got the gate down prior to this date." Rachel also reported that Laura "never went to the backdoor before; but her family had informed her on this date [Laura] had shown interest in it the week she was at [treatment]." As for the security of the fenced-in yard, the officer declined

to say that a whole section of fencing was missing, but asserted that there was a "gap" through which Laura could have passed to reach the street.

The court found that Rachel had abused or neglected Laura by failing to exercise a minimum degree of care in providing Laura with proper supervision resulting in a risk of imminent harm.

## II.

Rachel appeals the finding that she abused or neglected her daughter, and presents the following points for our consideration:

> POINT I: THE TRIAL COURT'S FINDING OF ABUSE AND NEGLECT IS NOT SUPPORTED BY THE EVIDENCE
>
> > A. The Standard Of Review Is <u>De Novo</u>.
> >
> > B. The Finding Of Abuse and Neglect Is Wide Of The Mark.
> >
> > C. The Case Law Applied By The Trial Court Is Easily Distinguished From the Instant Matter.
>
> POINT II: THE TRIAL COURT INAPPROPRIATELY FILLED IN THE GAPS IN THE DIVISION'S CASE
>
> > A. The Lower Court Based Its Findings On Rachel's Knowledge Of The Danger When No Such Knowledge Existed.
> >
> > B. The Lower Court Made Unsupported Findings Regarding The Child Safety Gate.
> >
> > C. The Lower Court Made Findings Of Additional Dangers To The Child Not Based On The Evidence.

A-2862-16T1

The Law Guardian joins the Division in urging us to affirm the trial court's order.

## III.

We defer to a trial judge's factual findings, as long as they are supported by substantial credible evidence. N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007). "This court accords deference to the Family Part's findings of fact 'because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family.'" N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 143 (App. Div. 2016) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012)). However, we owe less deference to findings drawn from the papers, as opposed to live testimony and credibility determinations based on a witness's demeanor. Ibid.

We will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 38 (2011). "Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our review." N.J. Div.

of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (citation omitted).

We exercise de novo review of issues of law. Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). In particular, the finding that conduct constitutes gross negligence, as opposed to simple negligence, is a "'conclusion of law to which we are not required to defer.'" Dep't of Children & Families v. T.B., 207 N.J. 294, 308 (2011) (quoting N.J. Div. of Youth & Family Servs. v. A.R., 419 N.J. Super. 538, 542-43 (App. Div. 2011)).

We begin with a review of the trial court's factual findings. We are convinced the trial court premised its decision on some findings of fact that lack sufficient support in the record. Although some of the errors are harmless, others undermine the court's conclusion that Rachel was grossly negligent.

There was sufficient support in the record for the trial court's finding that Laura "had knocked down the baby gate, had opened the back door, and had gone down the stairs leading from the home . . . ." However, Laura did not "exit[] the yard via a broken fence panel"; the officer testified that a panel was not missing, and that there was simply a gap in the fence. Unlike a "broken fence panel," a mere gap may have been more likely to have escaped Rachel's notice.

We do not quarrel with the findings that Laura was out of the house for "a minimum of forty minutes" without Rachel's knowledge; and Rachel did not use the nanny cam, assuming she had one. But, there is no support for the court's conclusion that Rachel misled the court. Her implausible contention was made to the caseworker.

We are constrained to defer to the court's finding that Rachel was so "oblivious to the potential harms to her child that she did not even realize that the knocked down baby gate could mean that her daughter was no longer safe." However, it is equally plausible that Rachel was so focused on responding to a police officer at her door that she did not immediately appreciate the significance of the downed gate. The officer testified that Rachel first realized that something was amiss with Laura when he informed her that Laura was found near the highway.

There was ample support for the court's conclusion that Laura faced a risk of imminent harm while she wandered about the mobile home community. She was walking in the middle of a roadway. However, the court erred in concluding that Laura was "found" 200 to 250 feet from her home. The neighbor found her some distance before the intersection that was 200 to 250 feet from her home. But, that does not matter. Calamity could have befallen Laura, had it not been for several fortunate events, beginning with a neighbor spotting her. She and the other neighbor sought to

protect the child. The pick-up truck driver attentively stopped in front of her. Laura did not wander into Route 1 before she was found. And, the sergeant recognized the child, avoiding a prolonged and anxious search for Laura's home.

However, the record does not support the court's conclusion that when Rachel retreated to her bedroom, she was aware that Laura had "expressed interest in exploring the area outside of the home via the backdoor of the mobile home and a broken fence that surrounded the yard." Based on that finding, the court concluded that Rachel intentionally disregarded the risk that Laura would try to leave by the backdoor. The only possible basis for the court's finding is the statement in the investigative summary that on the day Laura was found, Rachel's "family had informed her . . . [that Laura] had shown interest in" the backdoor.

Yet, the investigative summary did not state whether Rachel was so informed before Laura got away, or afterwards. During the almost hour-and-a-half between Laura's return, and the caseworker's interview, Jack and his parents arrived in the home, and may have passed on to Rachel what Laura had done during the week Rachel was gone. Furthermore, the investigative summary does not support the conclusion that Laura had expressed an interest in exploring the outside by passing through the fence, let alone

11

that Rachel was aware of such interest, or that she was aware of a "gap" in the fence, as the officer described it.

As Laura did not suffer actual harm, the Division had the burden to prove by a preponderance of "competent, material, and relevant evidence," N.J.S.A. 9:6-8.46(b), that Laura's "physical, mental, or emotional condition . . . [was] in imminent danger of becoming impaired as the result of the failure of [Rachel] . . . to exercise a minimum degree of care . . . in providing the child with proper supervision . . . by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . ." N.J.S.A. 9:6-8.21(c)(4)(b); see also N.J. Dep't of Children & Families v. E.D.-O., 223 N.J. 166, 178 (2015) (noting that the Division need not prove actual harm).

A "minimum degree of care" encompasses "conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., 157 N.J. at 178. A parent is wantonly negligent when he or she engages in conduct knowing that "injury is likely to, or probably will, result." Ibid. In other words, "willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others." Ibid. Mere negligence does not suffice to establish abuse or neglect under the statute. T.B., 207 N.J. at 306-07; G.S., 157 N.J. at 172-73. Furthermore, "every failure to perform a cautionary act is not abuse or neglect." T.B., 207

12

N.J. at 306. A "merely negligent" failure "does not trigger section (c)(4)(b) of the abuse or neglect statute." Id. at 307.

Whether a parent has failed to exercise a minimum degree of care where there is no actual harm "is fact-sensitive and must be resolved on a case-by-case basis." E.D.-O., 223 N.J. at 192. The Court has warned that in undertaking this analysis, trial and appellate courts "must avoid resort to categorical conclusions." Id. at 180 (citing T.B., 207 N.J. at 309).

Applying these principles to the facts that are supported by the record, the Division failed to meet its burden. Rachel did not know that injury was likely, or a probable consequence of her actions. She took the cautionary step of placing her daughter behind a safety gate. She may have negligently installed the gate, but there was no proof that she knew it was not secure. She said it had never failed before.

The Division did not establish that family members told Rachel, before Laura left the home, that Laura expressed interest in the back door. Rachel's statement to the caseworker could support the conclusion that Rachel learned of Laura's interest after the incident. There also was no proof that Rachel was aware the back door was unlocked after Jack left for work, or that there was a gap in the fenced yard.

Mindful that these are fact-sensitive cases, it is difficult to infer general principles from other cases in which findings of abuse or neglect have been affirmed or reversed. Yet, parallels may be drawn between this case and T.B. In that case, a mother who negligently left her four-year-old son unsupervised under the mistaken belief that his grandmother was home, was found not to have abused or neglected her son. Id. at 296. Similarly, Rachel negligently failed to check on her daughter for at least forty minutes, under the mistaken belief that Laura was safe behind a gate, in a small mobile home in which Rachel was just a room away. Also, like the incident in T.B., which was "totally out of the ordinary," id. at 310, even the Division concluded that Laura's escape from the living room and the home was an "isolated and abberational incident."

Rachel did not knowingly leave her daughter alone in the home; she left her alone in a room of a small house while she was present. In contrast, the parent in E.D.-O., 223 N.J. at 169, left a nineteen-month-old child alone in a car with the motor running while she ran into a store. Yet, even in that case, the Supreme Court reversed the appellate panel's conclusion of abuse or neglect, remanding for an evidentiary hearing to explore such facts as the mother's proximity to the child, how long the car and

child were out of view, the ability of someone to gain access to the vehicle, and other extenuating circumstances.  <u>Id.</u> at 194.

We do not condone Rachel's decision to leave Laura out of sight for over forty minutes.  No extenuating circumstances justified retreating behind a closed door to make phone calls. Rachel could have talked on the phone with an eye on the child. She could have smoked a cigarette in a few minutes, or done so with the bedroom door slightly ajar.  She should have properly secured the child safety gate, and assured that the door was locked.  No doubt, Rachel was negligent.  However, we are unpersuaded she was grossly negligent.

Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2862-16T1