# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2435-14T3

NEW JERSEY DEPARTMENT
OF HUMAN SERVICES,

    Petitioner-Respondent,

v.

T.J.,

    Respondent-Appellant.

_____

Submitted November 28, 2017 — Decided July 16, 2018

Before Judges Carroll, Leone, and Mawla.

On appeal from the New Jersey Department of
Human Services, Docket No. DRA #12-001.

Richard M. Pescatore, PC, attorneys for
appellant (Jennifer M. Carlson, on the
brief).

Christopher S. Porrino, Attorney General,
attorney for respondent (Melissa H. Raksa,
Assistant Attorney General, of counsel; Gene
B. Rosenblum, Deputy Attorney General, on
the brief).

PER CURIAM

    Petitioner T.J. appeals from an October 8, 2014 final agency

decision issued by the Director of the New Jersey Department of

Human Services, Office of Program Integrity and Accountability (Department). The Director reversed the initial decision of the Administrative Law Judge (ALJ), who had dismissed the Department's decision to place T.J.'s name on the Central Registry of Offenders Against Individuals with Developmental Disabilities (Registry). The Director agreed with the Department that T.J. was grossly negligent in caring for T.N. (Patient), a resident at Woodbine Developmental Center (WDC), a state-operated residential facility for severely disabled men. We affirm.

I.

The following facts are undisputed. In 2006, T.J. was hired as a human services assistant (HSA) by WDC. As an HSA, T.J. provided direct care to the residents of WDC. WDC trained T.J. in areas including in-service abuse and neglect, use of mechanical restraints, and caring for residents with pica, "[a] perverted appetite for substances not fit as food or of no nutritional value[.]" Stedman's Medical Dictionary 1495 (28th ed. 2006).

T.J. volunteered to work overtime during the 11:00 p.m. to 7:00 a.m. shift on the night of January 12-13, 2011. She was assigned to provide one-to-one enhanced support for Patient in Cottage 16.

T.J. was not familiar with Patient because she was generally not assigned to Cottage 16. However, each WDC resident had a

client card that described his risks, required behavioral supports, behavioral plan, and other important details. Patient's card described him as follows. Patient is independent and ambulatory while indoors. He uses a wheelchair exclusively for out-of-cottage (OOC) transport. For cardiac reasons, precautions are to be considered before placing him in restraints. His behavioral risks include choking, pica, and aspiration pneumonia. Patient's pica disorder is severe, and he has ingested shower curtain rings, gastronomy tube connectors, electrical socket protectors, latex gloves, and other items, and chews on his shorts, blankets, and curtains. The card instructs the staff to "[k]eep all items that could possibly be ingested out of his immediate reach."

Following an investigation, the Department determined that during her January 13, 2011 shift, T.J. "committed a substantiated act of Neglect against [Patient]." Specifically, the Department found: T.J. was asleep five feet away from Patient with her back to him; her chair was covered with a plastic bag which created a potential pica hazard; T.J. placed Patient in a wheelchair to prevent him from walking around, which constituted an unauthorized restraint, for her own convenience; Patient was found to have a clothing protector (bib) in his mouth, which was unauthorized and a pica hazard; T.J. failed to document the pica incident and

otherwise maintain Patient's enhanced support log book; and T.J. failed to provide one-to-one enhanced support to Patient.

On April 27, 2011, the Department notified T.J. that her name would be placed on the Registry. T.J. appealed in a February 15, 2012 letter.[1] The Department transferred the appeal to the Office of Administrative Law on February 21, 2012.

Plenary hearings were held before the ALJ on seven dates between October 2012 and July 2013. During the hearing, WDC supervisors Cecilia Hope and Cynthia Eckeard Brown, Department investigator Richard Sweeten, and clinical psychologist Dr. George Ackley testified about WDC policies and Patient's treatment plan. T.J., WDC senior supervisor Sherry Manwaring, T.J.'s direct supervisor Delores Lee, and T.J.'s co-worker Joseph Egbeh testified about the events of January 13, 2011. After the testimony was concluded, the ALJ sua sponte ordered the Department to present Patient's log book covering weeks that included the January 13, 2011 incident.

During her testimony, T.J. admitted the following. At the beginning of her shift, she was given Patient's client card and read it prior to entering his room. She had been trained in

---

[1] Meanwhile, T.J. was removed from employment by WDC as a result of an earlier incident. The propriety of her removal was not at issue in this case.

enhanced support and understood she was to stay within arm's length of Patient at all times and document every half hour of her shift in his log book. She covered a chair in Patient's room with a plastic trash bag because she had "an issue with germs." She moved Patient from his bed to a wheelchair and restrained him without getting approval from a supervisor to do so. She did not record placing Patient in a wheelchair in his log book though "it should have been documented."

Manwaring was on duty during T.J.'s overnight shift, and testified as follows. While making her rounds, Manwaring entered Cottage 16 around 3:40 a.m. on January 13, 2011. She entered Patient's darkened room along with Lee and saw "a wheelchair with [Patient] slumped over in it. He had a [bib] hanging out of his mouth." On the opposite side of the room, she observed T.J. curled up "in the fetal position" in a chair with her back to Patient. Manwarning testified that T.J.'s chair was approximately ten feet from Patient's wheelchair. Manwaring had Lee turn on the lights and Manwaring spoke to Patient and removed the bib from his mouth because it was a pica hazard.

During this sequence of events, T.J. was "non-responsive" — "she didn't move or anything" and it "appeared that she was sleeping." Manwaring "called her name [and] [s]he didn't move." Manwaring called her name again with the same result. After

Manwaring called T.J.'s name a third time, "she turned around, but she was very groggy . . . she didn't seem with it at all." Manwaring asked what Patient was doing, and T.J. "couldn't even answer . . . she was just kind of looking at me." Manwaring repeated the question, and T.J. responded, "sleeping."

Manwaring testified that T.J. had "a plastic bag on the back of [the chair]," which was a pica hazard. Manwaring testified that the chair was for the residents not the staff, and that the caregivers had their own plastic chairs. Manwaring also testified she checked the log book and found no entries between 12:30 a.m. and 3:40 a.m. There was also no notation on why or how Patient was placed in the wheelchair. Manwaring further testified that Patient was mechanically restrained in his wheelchair by the attachment of the chair's lap tray in a locked position. Manwaring testified that the lap tray lock was located "around the back of the chair" and that Patient could not get up while the tray was locked onto the chair.

Moreover, Manwaring testified that Patient was "[a]bsolutely not" supposed to be sleeping while restrained in a wheelchair by a locked lap tray. Manwaring further testified that Patient was "supposed to be in bed, and he has the right to choose not to be in bed if he doesn't want to be," and "if he wants to walk around the cottage, he should be allowed to walk around." Manwaring

6

testified that "[i]f a wheelchair is not ordered by a doctor or in [Patient's] plan, it is considered a restraint." Manwaring testified that Patient's plan only called for him to be placed in "a wheelchair with a seatbelt and laptop tray for OOC transport[.]" Thus, the placement of Patient in a wheelchair to sleep was not an approved restraint because the wheelchair was approved "for transport only."

The ALJ found "the testimony of Sherry Manwaring not credible," on the basis of entries in the log book that seemed to contradict her claim that Patient was to be placed in a wheelchair for transport purposes only. The ALJ made no credibility findings as to Hope, Eckeard Brown, Sweeten, and Dr. Ackley, and did not discuss their testimony.

The ALJ found that T.J. was "inattentive and groggy," that she was "more than an arm's length away from" Patient, that her "use of a trash bag to cover the fabric on the chair was objectionable," that she admittedly "did not fill in the client log every half hour," and that her conduct "warranted disciplinary action." However, based largely on the log book, the ALJ discredited Manwaring's testimony that T.J. was asleep, that T.J. improperly placed and restrained Patient in his wheelchair, and that Patient had a bib in his mouth. The ALJ ruled that the Department failed to meet its burden of proof to show T.J. acted

with gross negligence or recklessness. The ALJ dismissed the Department's finding of negligence, and ordered the Department to remove her name from the Registry. The Department filed exceptions, arguing that the ALJ's credibility findings were flawed due to the ALJ's interpretation of the log book.

On October 8, 2014, the Director issued a fourteen-page final decision that rejected and modified the ALJ's initial decision. The Director found that the ALJ's credibility determinations were "so baseless and unsupported by facts that they must be modified" and that the ALJ reached "baffling conclusions based on unexplained, unexamined and questionable evidence." Referencing the standard of care established by the testimony of Hope, Dr. Ackley, Eckeard Brown, and Sweeten, and crediting Manwaring's testimony, the Director ruled that T.J. committed acts of neglect and acted with gross negligence and recklessness. The Director concluded that T.J. was properly placed on the Registry. T.J. appeals.

II.

We must hew to our standard of review. "Appellate courts have 'a limited role' in the review of [administrative agency] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "An

appellate court affords a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014) (citation omitted). "In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (quoting Henry, 81 N.J. at 579-80).

T.J. argues the Director acted arbitrarily and capriciously in rejecting or modifying the ALJ's findings of fact and credibility determinations. We disagree.

Under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15, "[i]n reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so." N.J.S.A. 58:14B-10(c). However, "generally it is not for [courts] or the agency head to disturb [the ALJ's] credibility determination, made after due consideration of the witnesses' testimony and demeanor during the hearing." H.K. v. State, 184 N.J. 367, 384 (2005).

> The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or

unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the [Director] shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record.

[N.J.S.A. 52:14B-10(c).]

"In a case where an administrative agency's findings of fact are contrary to the findings of the ALJ who heard the case, there is a particularly strong need for careful appellate review." In re Lalama, 343 N.J. Super. 560, 565 (App. Div. 2001). Moreover, a reviewing court "need give no deference to the agency head on the credibility issue" when the Director has overturned the ALJ's credibility determinations of lay witnesses. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587-88 (1988). "It was the ALJ, and not the Director, who heard the live testimony, and who was in a position to judge the witnesses' credibility." Id. at 587.

After reviewing "the seven volumes of transcripts, evidential documents, closing arguments, and exceptions," the Director found the ALJ's initial decision was founded upon credibility findings that are not supported by sufficient, competent, rational, or trustworthy evidence." The Director found two principal reasons for rejecting the ALJ's credibility findings.

First, the ALJ's initial decision "never mentions the testimony and evidence given by four witnesses" who "testified . . . about the requisite and reasonable level of care that is expected of the caregiver." The Director faulted the ALJ's failure to analyze or reference the testimony of Hope, Eckeard Brown, Sweeten, and Dr. Ackley to determine the standard of reasonable care T.J. owed to Patient, concluding "[t]he enormous amount of testimony at [the] hearing establishing the polices of [WDC] and the initial decision's failure to recognize which witnesses were aware of them, let alone following them, undermines the credibility determinations that it contains."

The Director properly found credible the standard of care established by the testimony of Hope, Dr. Ackley, Eckeard Brown, and Sweeten as follows. Eckeard Brown's testimony "emphasized the importance of a pica regime and the danger of enhanced support personnel sleeping on duty." Dr. Ackley testified "[t]he duty of anyone giving one to one care of an individual with pica, and [specifically Patient]'s enhanced caregiver, is to constantly watch and constantly intervene if he were to get hold of something that he might ingest." Hope testified "that enhanced support required being within an arm's length of the client and watching the client continuously." Hope also testified that "documenting the enhanced support [every half hour in the log book] promotes .

. . '[a]ccountability of the staff that they are alert and providing the specified service for the man.'"

As the four witnesses testified, [Patient]'s cottage housed many individuals with pica, thus necessitating vigilant monitoring within arm's length by enhanced support. Items such as plastic bags should be kept away from patients, and staff should not introduce unnecessary pica hazards.

Finally, Dr. Ackley, who helped develop Patient's support plan, testified that Patient was not to be restrained in his wheelchair, which was only for OOC transport. Eckeard Brown testified that residents are free to choose to sit in their wheelchairs if they desire, but that it was inappropriate for enhanced support staff to restrain patients in wheelchairs without obtaining permission from a supervisor or doctor. Hope testified that all staff are trained that residents cannot be retrained for the convenience of staff, and that the staff may not put an ambulatory resident in a wheelchair with the lap tray down as a restraint unless authorized by a supervisor.

The Director concluded that "[r]oughly half of the testimony, concerning the proper policies and procedures, was never mentioned and evidently, never considered." The Director found that without considering those policies, the ALJ's "determination of the veracity of testimony concerning the application of those policies

A-2435-14T3

is invalid [and] not based on sufficient, competent, rational, or trustworthy evidence." We agree.

Second, the Director found that the ALJ's "reasons cited in the initial decision for slighting Manwaring's credibility are not borne out in the extensive record." In particular, the Director criticized the ALJ's reliance on the log book entries to discredit Manwaring.

As the Director noted, seven of the eight witnesses testified that the staff are allowed to use Patient's wheelchair only for transport. The only exception was T.J., whom the ALJ did not credit.[2] Thus, substantial evidence supported the Director's finding that T.J.'s use of a wheelchair to confine Patient violated the standard of care.

Nonetheless, the ALJ "found Manwaring incredible because she emphatically testified that residents are never placed in their wheelchairs for the convenience of staff." The ALJ found "Manwaring was not forthcoming to this tribunal regarding the extent to which [Patient] was being placed in his wheelchair for staff's convenience, and there[fore] she was deemed not credible." The ALJ based those conclusions entirely on "the log book that was

---

[2] Lee testified that she had not been familiar with Patient's wheelchair plan, but upon examining Patient's client card acknowledged it provided only for use of the "[w]heelchair with seatbelt and lap tray for OOC transport."

requested by the undersigned" which "seriously undermined the [Department's] case." As a result, the ALJ concluded that Manwaring's testimony was "flatly untrue," and that testimony from Manwaring and the Department's other witnesses that residents were not placed in wheelchairs for the staff's convenience "rais[ed] the spectre of 'false in one false in all.'"

The ALJ stated there were "fifty entries in the log book between December 24, 2010, and January 12, 2011, wherein [Patient] was logged in as sitting in <u>his</u> wheelchair watching television or doing something similar." The ALJ insisted that: "[Patient]'s log book contained documented proof that he was routinely placed in his wheelchair for non-transportation purposes (<u>i.e.</u>, for the staff's convenience)"; "the log book . . . demonstrate[ed] that the WDC permitted staff members to routinely place [Patient] in his wheelchair"; it showed WDC "[m]anagement and staff condoned and approved the practice of "[placing Patient in his wheelchair; "WDC management knew, or should have known, that [Patient] was being placed in his wheelchair for staff convenience, and did not do anything about it until this matter arose."

The ALJ's conclusions drawn from the log book were not supported by sufficient, competent, credible evidence, and were unreasonable. To reach these conclusions, the ALJ ruled entirely on the log book, and asserted the log book "does speak for itself."

A-2435-14T3

However, almost all the log book entries for the period cited by the ALJ were consistent with Patient choosing to sit in his wheelchair, and gave no indication Patient was "placed" in his wheelchair by enhanced support staff, let alone restrained in his wheelchair. Typical entries included: "[Patient] back in wheelchair, unit #4 hallway"; "[Patient] sitting in his wheelchair in unit #4!"; "[Patient] sitting in his wheelchair watching T.V."; "[Patient] is sitting in his wheelchair"; "[Patient] walk around the building, now back in dayroom in his wheelchair watching T.V."; "[Patient] up dressed and in his wheelchair"; "[Patient] sitting in his wheelchair relaxing and watching T.V. [in] unit 4 with staff"; "[Patient] back in his wheelchair sitting in back day room watching T.V."; and "[Patient] took a walk around the building for about 15 mins. and returned in his wheelchair, and is in dayroom."

Of the fifty-five log entries that indicated Patient was in his wheelchair, there are only three or four entries suggesting that Patient was "placed" in the wheelchair by staff. The 6:55 a.m. entry from January 7, 2011, stated, "[Patient] is awake, and is administered [hygiene] and placed in his assigned w/chair." The 1:50 a.m. entry on January 11, 2011, stated, "[Patient] awake place in his wheelchair will not stay in bed!" However, these entries do not state that Patient was restrained in the wheelchair.

The 5:30 p.m. entry from January 6, 2011, stated: "[Patient] is in back dayroom watching T.V. Let [Patient] out of wheelchair to walk around day room and exercise for a little bit." However, the prior entry from 5:00 p.m. on that day stated that Patient's colostomy bag "was off his stomach" and his enhanced support had taken "him to nurse to replace bag." Thus, it could also be inferred if Patient had been restrained in his wheelchair in that instance, it may have been for a medical or safety reason after having his colostomy bag replaced. In any event, one or even four instances out of the fifty-five entries was insufficient to show that the staff routinely placed or restrained Patient in his wheelchair for staff convenience, contrary to the testimony of all of the Department's witnesses.

By contrast, the ALJ's interpretations of the entries were not supported by any other evidence. There was no testimony regarding the log entries of any day except for the January 13, 2011 incident with T.J. Thus, there was little if any evidentiary basis to conclude either that Patient was placed or restrained in his wheelchair for staff convenience, and no evidence that it was done regularly or condoned by the WDC.

Thus, as the Director determined, "[t]he ALJ made his own interpretations of the many entries, by the numerous authors, with no contextual evidence." The Director could permissibly find that

16

was "not a valid basis to form a finding of credibility" against Manwaring. See ZRB, LLC v. N.J. Dep't of Envtl. Prot., 403 N.J. Super. 531, 562 (App. Div. 2008) (holding it was not unreasonable for the agency head to reject an ALJ's credibility findings because "the number of visits to a site cannot form the sole basis on which to base credibility"). Moreover, the record provides no guidance as to whether the staff had received supervisory or medical approval to place Patient in his wheelchair. Lacking such crucial information here, it was impossible for the ALJ to draw any conclusion about the reasons for Patient being in his wheelchair without resorting to conjecture.

The ALJ also found that "Manwaring actually appears to have initialed her approval of [placing Patient in his wheelchair] on January 9, 2011," and that "charging [T.J.] with violating the WDC restraint policy when Manwaring directly or indirectly approved similar conduct and even signed off on it in the log is extraordinary." However, there was no testimony that supervisors initialed the log book to indicate their approval of the enhanced support staff's log book entries or conduct. Rather, Manwaring, Lee, and Sweeten testified that supervisors initialed the logs to indicate that they had made their rounds at the proper intervals. Manwaring and T.J. testified that when Manwaring made her January 13, 2011 rounds, she initialed Patient's log book even though T.J.

had failed to properly maintain Patient's log up to that point. There was no indication that her initials indicated approval of T.J.'s conduct. To the contrary, Manwaring instructed T.J. to properly update her log book entries. Thus, the Director correctly found that the ALJ's use of the log book as the basis for credibility findings was arbitrary, capricious, unreasonable, and unsupported by sufficient evidence.

The ALJ also stated that "[t]he conflicting reports from Egbeh, Lee, Manwaring and [T.J.], together with the preexisting conflict between Manwaring and [T.J.], significantly undermined proofs offered by" the Department. However, neither ground supported the ALJ's discrediting of Manwaring.

First, any conflict of Manwaring with Egbeh's testimony was irrelevant because the ALJ "found the testimony of Joseph Egbeh incredible." Similarly, the ALJ found that T.J.'s "testimony was vague and inconsistent, substantially reducing [its] weight and credibility," and that T.J. "had poor independent recall of the incident, other than her recorded statements," which were inconsistent with each other and with her trial testimony.[3]

---

[3] Although the ALJ based on the log book credited T.J.'s testimony, which Egbeh denied, that Egbeh told T.J. she could use the wheelchair as a restraint and helped her carry Patient into the wheelchair, T.J.'s use of Patient's wheelchair as a restraint was still contrary to his client card and WDC policy.

Lee's testimony differed from Manwaring as Lee said T.J. was awake and responded when Manwaring called her name. However, the Director did not dispute that T.J. was awake and ultimately responded. In any event, the ALJ found Lee only "marginally credible," and noted "Lee committed many disciplinary infractions (not making rounds, not supervising [T.J.], permitting [Patient] to remain in a wheelchair), and since she was facing discipline when she authored her incident reports, I was concerned that some statements therein might be shaded or embellished."[4]

Second, the ALJ found Manwaring had a preexisting conflict with T.J. because T.J. had filed a grievance several years earlier claiming Manwaring was mistreating her. However, the grievance was never litigated and was not sent to Manwaring. Manwaring testified she was unaware of any grievance, and the WDC's Human Resources manager testified Manwaring would not have been informed of the grievance. As there was no evidence Manwaring was aware of the grievance, the ALJ had no basis to find Manwaring had any "animus" against T.J.

---

[4] The Director found Egbeh's testimony was "marginally credible," and Lee's testimony was not credible. We need not review the Director's slightly different appraisal regarding these witnesses, because the outcome would be the same even if we adopted the ALJ's appraisal.

A-2435-14T3

Accordingly, we find that under N.J.S.A. 52:14B-10(c), the Director properly determined that the ALJ's credibility findings as to Manwaring were arbitrary, capricious, unreasonable, and not supported by credible evidence in the record. Thus, the Director was authorized to reject those findings. Unlike the ALJ's findings, the Director's findings were supported by sufficient, competent, and credible evidence in the record.

### III.

T.J. argues that the Director acted arbitrarily and capriciously in concluding that T.J. had committed gross negligence and placing her name on the Registry. We disagree.

In L. 2010, c. 5, the Legislature created the Registry to provide "for the protection of individuals with developmental disabilities by identifying those caregivers who have wrongfully caused them injury." N.J.S.A. 30:6D-73(a).[5] As the "safety of individuals with developmental disabilities receiving care from State-operated facilities . . . shall be of paramount concern[,]" the Legislature sought "to assure that the lives of these innocent individuals . . . are immediately safeguarded from further injury

---

[5] All our citations to the act are to the original version of the act, effective October 27, 2010, which existed at the time of the January 13, 2011 incident.

and possible death and that the legal rights of such persons are fully protected."  N.J.S.A. 30:6D-73(b), (c).

Thus, the Registry was established to "prevent caregivers who become offenders against individuals with developmental disabilities from working with individuals with developmental disabilities."  N.J.S.A. 30:6D-73(d).  Any caretaker added to the Registry is prohibited from future employment by the Department and "those facilities or programs licensed, contracted, or regulated by the department, or from providing community-based services with indirect State funding to persons with developmental disabilities[.]"  N.J.S.A. 30:6D-77(c)(3); see N.J.A.C. 10:44D-1.1.

To effectuate these goals, the act required reporting to the Department if "an individual with a developmental disability has been subjected to abuse, neglect, or exploration by a caregiver."  N.J.S.A. 30:6D-75(a)(1).  "Neglect" is defined as "willfully failing to provide proper and sufficient food, clothing, maintenance, medical care, or a clean and proper home; or failure to do or permit to be done any act necessary for the well-being of an individual with a developmental disability."  N.J.S.A. 30:6D-74.  If there is "a substantial incident" of neglect, the offending caregiver shall be included on the central registry," N.J.S.A. 30:6D-76(1), if the caregiver "acted with gross negligence,

recklessness, or in a pattern of behavior that causes or potentially causes harm to an individual with a developmental disability." N.J.S.A. 30:6D-77(b)(2). The regulations further defined the terms:

> 1. Acting with gross negligence is a conscious, voluntary act or omission in reckless disregard of a duty and of the consequences to another party.
>
> 2. Acting with recklessness is the creation of a substantial and unjustifiable risk of harm to others by a conscious disregard for that risk.
>
> [N.J.A.C. 10:44D-4.1(c).]<sup>6</sup>

The Director found T.J.'s conduct was grossly negligent. The ALJ's "determination that [T.J.'s] conduct was negligent but not grossly negligent is a conclusion of law to which we [and the agency head] are not required to defer." See N.J. Div. of Youth & Family Servs. v. A.R., 419 N.J. Super. 538, 542-43 (App. Div. 2011); see Dep't of Children & Families v. T.B., 207 N.J. 294, 308 (2011) (stating A.R. "properly reject[ed] the contention that" such determinations "are entitled to deference"); see also N.J.S.A. 52:14B-10(c). Nonetheless, we find no cause to disturb

---

<sup>6</sup> These regulations became effective on June 6, 2011, but T.J., the Department, the ALJ, and the Director have relied upon them without objection. In any event, the regulation's definition of "gross negligence" and "recklessness" mirror those in Black's Law Dictionary, 1134, 1385 (9th ed. 2009).

the Department's determination that T.J.'s conduct was grossly negligent and that her name should be placed on the Registry.

The Director concluded T.J. committed the following acts of neglect and gross negligence: being "inattentive and groggy to the point that she was not caring for" Patient; being "oblivious to the one client she has been assigned, whose pica presents such a danger that she is required to constantly observe him while remaining within an arm's reach"; her "action of locking [Patient] in his [wheelchair]"; her "use of a trash can liner to cover the back of the chair in [Patient]'s room [which was] a dangerous and unnecessary introduction of a hazard into the pica ward"; her "failure to monitor [Patient], and allowing him to place a bib in his mouth"; and her failure to stay within "an arm's length from [Patient]," "to maintain the log book and . . . to report an incident of pica."

The Director's findings that T.J. committed these acts and omissions were supported by substantial, credible evidence, particularly by Manwaring's testimony. These acts and omissions constituted neglect, as T.J. was "willfully failing to provide proper and sufficient . . . maintenance" and failing "to do . . . any act necessary for the well-being of an individual with a developmental disability." N.J.S.A. 30:6D-74.

Moreover, T.J. "acted with gross negligence [and] recklessness." N.J.S.A. 30:6D-77(b)(2). First, her acts and omissions were "in reckless disregard of [her] duty and of the consequences to [Patient]." N.J.A.C. 10:44D-4.1(c)(1). In particular, her introduction of a pica hazard into Patient's room, and her unauthorized restraining of Patient in the wheelchair, were undeniably "conscious, voluntary" acts of gross negligence. Ibid. Second, her acts and omissions created "a substantial and unjustifiable risk of harm to others by a conscious disregard of that risk." N.J.A.C. 10:44D-4.1(c)(2). Her recklessness and the resultant risk is best demonstrated by her introduction of the pica hazard, and her decision to curl up in a chair with her back to Patient, unaware he had put a bib in his mouth. Her gross negligence and recklessness could "potentially cause[] harm" to Patient. N.J.S.A. 30:6D-77(b)(2).

T.J.'s only duty during her January 13, 2011 overtime shift was to provide care to Patient, who suffers from severe pica. T.J.'s failure to stay alert, attentive, and within an arm's reach, and her introduction of a pica hazard, exposed Patient to unacceptable potential dangers. It was not arbitrary, capricious, or unreasonable for the Director to include her name on the Registry to prevent other patients from being put at risk.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24

A-2435-14T3