# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3411-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.T.,
     Defendant,

and

M.J.,
     Defendant-Appellant,

_____

IN THE MATTER OF G.J.,
a Minor.

_____

Submitted May 18, 2021 – Decided June 14, 2021

Before Judges Fisher and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FN-20-0111-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Patricia Nichols, Assistant Deputy Public Defender, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.J. (Max) appeals from Family Part orders, the first entered after a fact-finding trial resulting in the trial judge's determination that Max abused or neglected his daughter, G.J. (Gemma); the second after the judge terminated litigation under the FN docket, continued Gemma's physical custody with her maternal grandmother L.A. (Lucy) and continued Gemma's legal custody with Lucy, jointly shared with her parents, Max and T.T. (Talia).[1] The second order also provided Max "the right to file an FD application for visitation." He argues:

> POINT I- THE TRIAL [JUDGE] FAILED TO
> ENFORCE THE REQUIREMENTS FOR PROPER

---

[1] We use pseudonyms for the parties and the child to protect their privacy, preserve the confidentiality of the proceedings and for the reader's convenience. R. 1:38-3(d)(12).

ADMISSION OF EVIDENCE OF INTOXICATION AND ERRED IN RELYING ON THE OFFICER OR DCPP INVESTIGATOR FOR THAT PROOF, UNDULY PREJUDICING DEFENDANT, COMPELLING REVERSAL OF THE JUDGMENT BELOW.

POINT II- BECAUSE THE TRIAL JUDGE ERRED IN ADMISSION OF EVIDENCE AND TESTIMONY, FAILED TO RECOGNIZE THAT THE PROOF AT TRIAL DID NOT SUSTAIN THE COMPLAINT, FAILED TO TETHER THE FACTS HE DID FIND TO ANY TITLE NINE CAUSE OF ACTION, AND FAILED TO PROPERLY ANALYZE THE FACTS IN CONJUNCTION WITH PROPER LEGAL PRECEDENTS, THE JUDGMENT MUST BE REVERSED.

[1.] Errors in judgment of abuse.

[2.] Errors in admission of documentary evidence.

[3.] Failure to consider totality of circumstances.

POINT III- DUE PROCESS VIOLATIONS AND ERRORS IN THE EXERCISE OF CARE AND SUPERVISION, OVER A FAMILY WHOSE NEEDS STEMMED FROM POVERTY, RESULTED IN A JUDGMENT AWARDING A CHANGE OF CUSTODY TO A THIRD PARTY THAT MUST BE REVERSED.

POINT IV- BECAUSE THE TRIAL [JUDGE] FAILED TO CONSIDER THE PRE-REQUISITE OF PSYCHOLOGICAL PARENTAGE BEFORE GRANTING A CHANGE OF CUSTODY TO A TEMPORARY CAREGIVER, THE JUDGMENT OF

3

THE TRIAL COURT HERE ON APPEAL MUST BE
REVERSED.

We discern no error in any of the judge's determinations and affirm.

In analyzing the trial judge's abuse-neglect determination, we need not recount defendants' long history with the Division of Child Protection and Permanency beginning on April 18, 2017, when Talia tested positive for benzodiazepine, opiates and cocaine while in the labor and delivery unit giving birth to Gemma. Talia informed the Division she believed Max was incarcerated, as he was when he first appeared in court six weeks after Gemma's birth and the court ordered a paternity test. Suffice it to say, after Max's release from custody, the court awarded Gemma's physical custody to him because he was sufficiently compliant with the Division's services in 2017 and 2018.

After Max moved with Gemma from his sister's house to the Newark YMCA on September 4, 2018, the Division received several reports that Gemma was not being cared for properly. We note the judge ruled the details of those referrals inadmissible at the one-day fact-finding trial. He found the Division, although Max had not notified it of his change of address, approved the YMCA location, and "there was no indication that [Gemma] was being harmed."

The Division's abuse-neglect claim against Max began with a referral from the Newark Police Department on September 11, 2018. To substantiate that

4

claim, the Division called three witnesses: Newark Police Officer Yolanda Concepcion; the Division's emergency investigator, Jennifer Vilfranche; and the Division caseworker, Sebastian Anthony. From their testimony which the judge deemed credible, and "a number of documents" from which "all of the imbedded hearsay . . . [was] redacted [and] not considered" by the judge, he found Gemma "was in imminent danger of becoming harmed" because Max, "her sole custodian at the time[,] wasn't able to . . . even care for himself, never mind care for an [eighteen]-month-old child."[2]

Max claims the judge utilized improper testimony from the officer and the emergency investigator to find he was intoxicated without any further documentation to prove "any offense based on intoxication." We disagree and affirm substantially for the reasons set forth in Judge Richard C. Wischusen's cogent oral opinion.

The Division was not required to prove Max was intoxicated. It was required to prove Gemma was

> a child whose physical, mental, or emotional condition
> has been impaired or is in imminent danger of
> becoming impaired as the result of the failure of his

---

[2] Gemma was born on April 18, 2017. While the trial judge and the Division differ in reporting Gemma's age at the September 11, 2018 incident throughout the record, she was in fact sixteen months old. The slight discrepancy has no impact on our analysis.

parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . .; or by any other acts of a similarly serious nature requiring the aid of the court[.]

[N.J.S.A. 9.6-8.21(c)(4)(b).]

We previously observed that our "Supreme Court ascertained that ['minimum degree of care'] means 'grossly or wantonly negligent, but not necessarily intentional' conduct." N.J. Div. of Child Protection & Permanency v. J.A., 436 N.J. Super. 61, 68 (App. Div. 2014) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999)). We explained:

> In that sense, a parent fails to exercise a minimum degree of care when, despite being "aware of the dangers inherent in a situation," the parent "fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." G.S., 157 N.J. at 181. The parent is held to what "an ordinary reasonable person would understand" in considering whether a situation "poses dangerous risks" and whether the parent acted "without regard for the potentially serious consequences." Id. at 179.
>
> Our Supreme Court later illuminated G.S.'s interpretation, explaining that "every failure to perform a cautionary act is not abuse or neglect"; "[w]hen the failure to perform a cautionary act is merely negligent, it does not trigger" the statute. N.J. Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 306-07 (2011). The

6

focus on the parent's level of culpability in assessing whether a minimum degree of care has been exercised

> is in synchronicity with the Legislature's expressed purpose to safeguard children. Indeed, where a parent or guardian acts in a grossly negligent or reckless manner, that deviation from the standard of care may support an inference that the child is subject to future danger. To the contrary, where a parent is merely negligent there is no warrant to infer that the child will be at future risk.

[J.A., 436 N.J. Super. at 68-69 (alterations in original) (quoting, in the last instance, T.B., 207 N.J. at 307).]

"In cases where the child has not suffered actual harm, the Division must 'demonstrat[e] some form of . . . threatened harm to a child.'" Dep't. of Children & Fams., Div. of Child Protection & Permancy v. E.D.-O., 223 N.J. 166, 181 (2015) (alterations in original) (quoting N. J. Dep't. of Children & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013)). "Judges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm. Instead, the fact-sensitive nature of abuse and neglect cases . . . turns on particularized evidence." A.L., 213 N.J. at 28.

That evidence, as parsed by Judge Wischusen, included Concepcion's testimony that when she first saw Max, Gemma was in a stroller in his sole care and Max "was unable to stand on his own, . . . he needed to be held up by two

special officers from the Newark Police Department . . . so that he did not fall down." Max was unable to provide Concepcion with the name of a relative who could assume care of Gemma, and "was unable to even use his own phone so that they could access the phone numbers contained within his phone to contact a family member." The judge further found Max "was unable to provide the child's name during the time that for the most part, when [Concepcion] tried to speak to [Max], he was only able to mumble in response to the questions that she was asking him about relatives [and] the child's name[.]"

When Concepcion asked Max if he was under the influence of any medication that would explain his condition, he "did not indicate he was under any such medication." Max's condition prompted Concepcion to call emergency medical services (EMS) to the scene. When EMS workers tried to engage Max, he "remained incoherent and was unable to carry on a conversation." Max was placed in Concepcion's patrol car and, "a short time later while they were still at the scene, [he] came out of his stupor and became extremely agitated . . . cursing and kicking the back of the car and striking the divider" between the front and back seats. He continued that behavior until they arrived at the station house.

From Concepcion's "extremely credible" testimony, the judge also found

> the observations that she made, the glazed
> eyes, the inability to stand, the inability to

8

communicate, the mumbling responses, later the violent outbursts, the uncontrollable behavior while in the back of the car, all confirmed . . . Concepcion found [Max] while he was under the influence of something, which made him unable to safely care for the child.

Judge Wischusen also considered Vilfranche's testimony. Contrary to Max's merits-brief argument that the judge "turned a blind eye to the facts in evidence that directly contradicted portions of the decision" and rebutted the Division's evidence, the judge noted Max, during his interview with Vilfranche at University Hospital, explained he was riding a bus with Gemma when he

was approached by an unidentified man and later a woman who were yelling at him and attempting to take the stroller away from him, that the police were . . . flagged down, that the unidentified people at the scene reported that [Max] said that he was intoxicated, that he denied that he was intoxicated, that he was arrested regardless.

The judge properly found Max did not provide Vilfranche with any explanation for his condition at the scene. Instead, as he did with Concepcion, Max "did not indicate that he was under the influence of a prescribed medication, but further indicated that he was not intoxicated and blamed it on the police for unfairly arresting him."

 A-3411-19

The judge credited Concepcion's testimony, based on twenty years' experience as a patrol officer in Newark, albeit without any "formal training with respect to the detection as to whether somebody is under the influence," that Max "seemed like he was on drugs," and "looked like he was on something." The judge also considered that Max, at trial, did not proffer any explanation for his behavior. His conclusion that Max abused or neglected Gemma was based on Max's readily observable incoherence—no matter the cause—while Gemma was in his care. The judge noted, even if Max had been acting under the influence of a prescribed drug, "that would not give justification for him going out into the public into the streets of Newark, [in] a bus, with a baby . . . while in such a condition." He concluded Max's

> condition was of such a degree that he could not possibly safely care for a one-and-a-half-year-old child . . . while he was out on the street, not while she was in a stroller, not while he was unable to even communicate with emergency workers and police . . . when they responded to the scene.

That condition, the judge determined, "was of such a nature that [Gemma] was exposed [to] imminent risk of harm[.]" Judge Wischusen found Max's actions had risen to the level of being "grossly negligent or reckless." See T.B., 207 N.J. at 307.

A-3411-19

"We have a strictly limited standard of review from the fact-findings" of a trial judge sitting in the Family Part. N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577-78 (App. Div. 2010). Those findings will not be disturbed on appeal when they are "supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974). We "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (citation and internal quotations marks omitted). Moreover, we accord special deference to findings made by Family Part judges "[b]ecause of the family courts' special jurisdiction and expertise in family matters[.]" Cesare v. Cesare, 154 N.J. 394, 413 (1998). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).

Under that lens, we see no reason to disturb Judge Wischusen's sound findings of fact and conclusions of law. The judge eruditely recognized he was "not required to wait until [the] child is actually harmed by parental inattention

or neglect before he acts in the welfare of a child," citing New Jersey Division of Youth and Family Services v. V.M., 408 N.J. Super. 222, 235-36 (App. Div. 2009) (Carchman, J., concurring). Contrary to another of Max's arguments, the judge considered the "totality of the circumstances" in determining whether Max created a "substantial risk" of harm to the child in his care. N.J. Div. of Youth & Fam. Servs. v. C.M., 181 N.J. Super. 190, 201 (App. Div. 1981). And his determination was "based on competent reliable evidence" and "factual findings [that were] supported by evidence admitted during the hearing." N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 265 (App. Div. 2002).

Any reference by the judge to intoxication does not change the found fact that Max was in no condition to care for Gemma. Thus, even if there was insufficient foundation to admit Concepcion's testimony as a lay opinion that she believed Max was intoxicated by some substance, her observations of Max's condition were admissible. Police officers, like any other fact witness, can testify to "what the officer did and saw" at the scene. State v. McLean, 205 N.J. 438, 460 (2011). "Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." Ibid.

We determine the remainder of Max's arguments regarding the trial judge's decision to be without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E). We note only that Judge Wischusen carefully considered and redacted any documentary evidence and, indeed, his findings—based on admissible testimony he found credible—established the Division's burden by a preponderance of the evidence. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 398 (2009).

We also reject as meritless Max's other hyperbolic merits-brief arguments regarding the judge's custody award. The record belies his assertions that he and Talia were not provided with proper services and the judge skirted procedural safeguards to protect family reunification. From the moment Gemma was taken into the Division's custody and Max's paternity was established, the Division and the trial judges[3] worked with both parents to provide a variety of services from substance abuse to mental health counseling as well as multiple supervised visits with Gemma per week in an effort to unify Gemma with one or both of her parents. Notably, the services Max received resulted in his unification with Gemma.

---

[3] Other judges initially presided over the case.

Further, Judge Wischusen properly awarded Lucy physical custody. Following the September 11, 2018 incident, the Division took custody of Gemma. The Division's efforts to reunite Gemma with Talia were successful in January 2019. By July, however, Lucy filed an emergency application for custody after Talia left Gemma with a stranger, providing the stranger with a contact number for Lucy.

Initially, during hearings just after Talia surrendered Gemma to the stranger, Max questioned why Lucy was being given custody over his sister. The judge explained to Max that his sister had to file for custody to be considered as a possible custody alternative. One of Max's sisters was present in court and said she understood the judge's explanation. The judge also entertained Max's queries about where Lucy would be residing with Gemma and who else was in the home. Further, the Division had performed an assessment of Lucy's residence to ensure that Gemma was in a safe location; it also performed a background check on Lucy. As the Division highlights in its merit's brief, Max never proposed a valid alternative custody arrangement at any of the hearings. Although his sister had later applied for custody, she did not appear at the November 2019 custody hearing and the filing was dismissed.

At the FN dismissal hearing, neither Max nor Talia challenged Lucy's application for custody. In fact, Max agreed to it. As Max acknowledges in his merits brief, he was incarcerated on a parole violation and Talia was "hospitalized for some time for her psychiatric issues." Their circumstances, contrary to Max's merits brief contention, were not "used to deny them a voice in the decision-making for Gemma." Max's attorney agreed on the record with the dismissal and requested only visitation between Max and Gemma. Max's parental rights were never terminated at any stage of this litigation, and he maintains legal custody of Gemma with the right to request visitation. We discern no error in Judge Wischusen's custody award.

The balance of Max's arguments, including that the judge failed to consider alternatives and psychological parentage before granting Lucy physical custody, lack sufficient merit to warrant any mention. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15                                                                          A-3411-19